Johnny REYNOLDS, et al., Plaintiffs,

v.

ALABAMA DEPARTMENT OF
TRANSPORTATION, et al.,
Defendants.

Civil Action No. 85–T–665–N.

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 21, 1997.

Leonard Gilbert Kendrick, Montgomery, AL, Richard J. Ebbinghouse, Abigail P. van Alstyne, Robert L. Wiggins, Jr., Jon C. Goldfarb, Gregory O. Wiggins, C. Paige Williams, Rebecca Anthony, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, Julian L. McPhillips, Jr., McPhillips, Shinbaum, Gill & Stoner, Montgomery, AL, Rick Harris, Glassroth & Associates, Montgomery, AL, for Johnny Reynolds, Cecil Parker, Robert Johnson, Frank Reed, Onida Maxwell, Martha Ann Boleware, Peggy Vonsherie Allen.

Abigail P. van Alystyne, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Florence Belser.

Florence Belser, Montgomery, AL, pro se.

Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for William Adams, Cheryl Caine, Tim Colquitt, William Flowers, Wilson Folmar, George Kyser, Becky Pollard, Ronnie Pouncey, Terry Robinson, Tim Williams.

Thomas R. Elliott, Jr., Allen R. Trippeer, Jr., C. Dennis Hughes, Stephen L. Scott, London & Yancey, Birmingham, AL, William K. Thomas, R. Taylor Abbot, Jr., Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, AL, William H. Pryor, Jr., Attorney General, Montgomery, AL, Patrick H. Sims, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Mobile, AL, for Jimmy Butts, Halycon Vance Ballard, Department of Transportation, State of Alabama, Department of Personnel, State of Alabama, Fob James.

## ORDER

MYRON H. THOMPSON, Chief Judge.

The issue now before the court is defendant Alabama Department of Transportation's compliance with article XVI of consent

decree I[1] and with orders of this court entered on June 26, 1996, reaffirming the need for such compliance.[2] For reasons that follow, the court concludes that the department has failed to comply with the article and prior court orders.

## I. BACKGROUND

The relevant and salient events leading up to the submission of this issue are as follows:

● This lawsuit was filed in May 1985. The plaintiffs charged the defendants with employment discrimination based on race in the Alabama Department of Transportation. The plaintiffs are African–Americans, and they represent a class of African–American merit and non-merit system employees and unsuccessful applicants. The defendants include the Alabama Department of Transportation, the Alabama State Personnel Department, and several state officials. The plaintiffs base this lawsuit on the following: Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17; the fourteenth amendment to the United States Constitution, as enforced by 42 U.S.C.A. § 1983; and 42 U.S.C.A. § 1981. The jurisdiction of the court has been invoked pursuant to 28 U.S.C.A. § 1343 and 42 U.S.C.A. § 2000e–5(f)(3).

● The trial extended over several months in 1992, but ended before completion when the parties announced that they might be able to settle the litigation.

● In 1993, the parties reached a partial settlement, subsequently embodied in three consent decrees. In the wake of this new settlement, the court allowed a group of non-class members—consisting mostly of white employees of the Department of Transportation and now commonly referred to as the "Adams intervenors"—to intervene and challenge any race-conscious provisions in the settlement. *Reynolds v. Roberts,* 846 F.Supp. 948 (M.D.Ala.1994).

● On March 16, 1994, the court approved one of the consent decrees, now known as consent decree I.[3]

● Article XVI of consent decree I consists of two parts: a "Temporary special training program" and a "Regular Training Courses" program. The article provides as follows:

"1. Temporary special training program: During the first calendar year following the effective date of the Settlement Decree, the Highway Department will develop and provide to all black employees a temporary special affirmative action training program with the goal of assisting such employees in progressing in career paths within the Highway Department. Such program will be provided again during the years 1997 and 1999.

"2. Regular Training Courses: During the term of this Settlement Decree, the State Highway Department will offer training courses to employees subject to and in accordance with the provisions of the following subsections:

(a) The employees to whom such training courses will be offered will be all Highway Department employees who are working, during the calendar year in which the courses are offered, on a merit system job and have worked at least 540 hours of work during such year or the prior year on such job; provided, however, that Laborers will be treated the same as all HMT's for purposes of eligibility for such training courses.

(b) The training courses to be offered to such employees are set forth in the attached Appendix ____ to this Settlement Decree and a course or courses designed to clarify and update black employees on the procedures to be followed and qualifications, training, and experience to be credited in filling higher classified jobs within the Highway Department.

(c) The Highway Department will monitor the enrollment of employees taking training courses in order to ensure to the extent ·practicable that interested

---

**1.** Doc. no. 553; 1994 WL 899259 (M.D.Ala. 1994).

**2.** Doc. nos. 1091 and 1097.

**3.** Doc. no. 553; 1994 WL 899259 (M.D.Ala. 1994).

black employees are receiving their fair share of participation in such training courses.

(d) The training courses to be offered pursuant to the Training section of the Settlement Decree will be started within 120 days after the effective date of the Settlement Decree and thereafter will be offered on an annual basis.

"3. The training courses provided for by this Article will be offered to the employees eligible therefore, with such employees having the option to accept or decline the training courses. Offers and declinations of training opportunities shall be documented in writing and signed by the affected employee." [4]

● On May 28, 1996, Special Master Winn S.L. Faulk entered a recommendation for the disposition of the grievance of plaintiff-class-member David Lee Sims that the Transportation Department had violated article XVI.[5] With regard to Sims's grievance, the Special Master made a number of specific findings, including the following: that "the current system of on-the-job training, which requires that an employee who desires training ask a knowledgeable fellow employee to conduct such training during breaks, lunch hours and slack time is not calculated to provide the sort of training that is needed to overcome the effects of past racial discrimination in the Department of Transportation"; that, "While on-the-job training almost invariably has its place in industry, it can rarely serve as the sole means of training, particularly where there is no formal system for assuring that it is made available to all employees on an equal basis"; and that "it appears that whether a particular employee receives training is ultimately left to the discretion of a non-supervisory fellow employee, who operates a particular piece of equipment, who has no formal obligation to conduct such training,

and who may be jealous of his position and unwilling to share his knowledge." [6] The Special Master further observed that "it seems somewhat disingenuous to proffer a training program in which the white beneficiaries of past race discrimination are expected to share knowledge they gained through such discrimination with the victims of the past discrimination without substantial leadership and influence being exercised by higher management within the Department of Transportation" and that it "is rather optimistic to expect individual victims to have the temerity to demand such training without active encouragement from higher management." [7] The Special Master then concluded that the "general unavailability of ... training poses a serious impediment to the advancement of Mr. Sims and other aspirants." [8]

The Special Master recommended that the court order the Department of Transportation "to formulate immediately a formal, comprehensive training program" for class members, as required by article XVI.[9] He also recommended that the department provide Sims with "thorough training in the operation of all types of machinery as may be listed from time to time in the announcements of continuous merit system examinations as being required 'knowledge, skills and abilities', along with training in any other services described as being part of the 'kind of work' in such announcements." [10]

● There were no objections to the *findings* or the *recommendation* by the Special Master,[11] and by order entered on June 26, 1996, the court required that the department file a report "reflecting *full* compliance with all of the requirements of article XVI by 4:00 p.m. on August 1, 1996." [12] The court required that the report "include, but be limited to, the following: (a) a description of the tempo-

---

4. *Id.*

5. Doc. no. 1037.

6. *Id.* at 3–4.

7. *Id.* at 4.

8. *Id.* at 5.

9. *Id.* at 10.

10. *Id.*

11. The department did object to other aspects of the Special Master's findings and recommendation. Doc. no. 1073.

12. Doc. no. 1091 (emphasis added).

rary special training program for black employees, required by article XVI, ¶ 1; (b) a description of the regular training courses to be offered to all employees, required by article XVI, ¶ 2; and (c) a description of the procedure for monitoring employee use of the training programs, required by article XVI, ¶ 2(c)" [13]

● In another order entered on June 26, 1996, the court made the following observations about the defendants' failure to comply with consent decree I:

> "The recent history of this litigation reflects that defendants Alabama Department of Transportation and Alabama State Personnel Board have failed to comply with many of the provisions of consent decree I. In addition, for whatever reason, the plaintiffs have not monitored sufficiently the defendants' compliance with the decree. A brief survey of recent orders of the court demonstrates this problem.
>
> ● On June 26, 1996 (Doc. no. 1091), the court entered an order regarding the defendants' failure to comply with the provisions of article XVI regarding the creation and implementation of training programs.
>
> ● On May 24, 1996 (Doc. no. 1033), the court entered an order regarding the defendants' failure to timely comply with articles IV and XV, requiring the defendants to complete the study of multigrade jobs and perform an analysis of individual reclassification requests.
>
> ● On April 23, 1996 (Doc. no. 989), the court entered an order requiring the department to file a report reflecting that it had complied with article XIII, ¶ 5(b), requiring the department to hire members of the plaintiff class.
>
> ● On February 7, 1996 (Doc. no. 922), the court entered an order requiring the defendants to file monthly reports pursuant to article XIX; this order was prompted by the State Personnel Board's failure to comply with the pro-visions of articles II, III, IV, and XV." [14]

The court concluded that "This survey makes clear that the defendants have failed to live up to the burdens they imposed on themselves when they entered into consent decree I." [15]

The court also noted that "This is not the first time that the court has attempted to ensure that the parties comply fully with the decree. In the February 7 order, the court considered, but ultimately declined, the appointment of a monitor to keep the court informed of the parties' efforts to comply with the obligations imposed on them by the consent decree. Although the court again declines to appoint such a monitor, the time has come for the parties to consider seriously whether they should do so on their own. An advantage to having such a monitor would be to ensure that the parties complied with the decree in an organized way, rather than having disputes come before the court piecemeal. However, as stated, the court is not now ordering the appointment of a monitor." [16]

The court then ordered that, by "August 1, 1996, the parties shall submit a *joint* omnibus report reflecting the following as to each provision and subsection of consent decree I, with each considered and described separately:"

> "(1) Whether there has been full compliance;
>
> (2) If there has been full compliance, the report shall include the following:
>
> (a) The date of full compliance;
>
> (b) Whether compliance was timely; and
>
> (c) A detailed description of the actions taken to comply; and
>
> (3) If there has not been full compliance, the report shall include the following:
>
> (a) Whether there has been partial compliance, and the extent of such partial compliance;
>
> (b) The reason for the failure to comply fully;
>
> (c) The date on which the parties expect that full compliance will be achieved; and

---

**13.** *Id.*

**14.** Doc. no. 1097 at 1–2.

**15.** *Id.* at 2.

**16.** *Id.*

(d) A detailed description of the steps the department will take to achieve full compliance." [17]

● The Department of Transportation was given an extension of time to respond to the first of the June 26 orders, and, on September 25, 1996, the department filed its report. The substantive content of the report in regard to article XVI was less than one page, stating essentially that, as to ¶ 1 of article XVI, they have established a "a career path training program," and that, as to ¶ 2, "training is monitored on a monthly basis and a report is generated monthly." [18]

● On September 30, 1996, the defendants filed a response to the second June 26 order, repeating essentially what had been said in the September 25 response.[19]

## II. DISCUSSION

■ The plaintiffs contend that the Transportation Department's reports of September 25 and 30 completely fail to comply with the court's orders of June 25, and, in particular, to the extent the orders seek enforcement of ¶ 1 of article XVI. In a belated brief filed on October 11, 1996, the department responds essentially that it has complied with ¶ 1 by putting into place and now monitoring a "career path counseling" program for African–American employees.[20] Under this program, black employees receive counseling as to their "current qualifications," their "aspirations ... in the department," the "types of training, education, and job experience the employee needs to pursue in order to advance in the chosen field," and how to pursue training and education both within and outside the department.[21] In other words, the department argues that its obligations under ¶ 1 extend to only procedural advice on where and how to fill out applications, on

where and how to pursue training already available, and on how the merit system works generally. The department's reading of its obligations under ¶ 1 is improperly and grossly constricted.

To be sure, the "temporary affirmative action training program" required by ¶ 1 has the "goal of assisting [African–American] employees in progressing in *career paths* within the Highway Department." [22] But, as is explained below, this goal is to be met through *substantive* and *aggressive* training of individual African–American employees in *knowledge, skills and abilities* needed because the department discriminatorily kept them in lower and less desirable classifications and lines of progression and because, as a result, they now lack necessary on-the-job training and experience; the goal cannot, and under ¶ 1 was not intended to, be met merely through some type of *passive* career path counseling.

At the fairness hearing held on January 19, 1994, on the consent decree I, the court was specifically led to believe that ¶ 1 of article XVI would require that the Transportation Department provide for substantive training in skills to its African–American employees, and, in particular, "on-the-job" "remedial training" in "skills" they did not "pick up" in "lower rated jobs" because of the department's past discriminatory acts.[23] At no time did anyone argue or even suggest that the goal of ¶ 1, while admittedly "progress[ ] in career paths," was to be achieved solely through "counseling" about career paths. Paragraph one dealt with lost opportunity for, and a current firm commitment to make up for and provide, substantive skills training, not merely counseling about how otherwise to obtain such skills. In response to objections to article XVI, the court explained at the hearing that it understood ¶ 1 of the article to mean the following:

---

17. *Id.* at 3.

18. Doc. no. 1233.

19. Doc. no. 1251 at 134–35.

20. Doc. no. 1286.

21. *Id.* at 2–3.

22. Emphasis added.

23. Transcript of hearing held on January 19, 1994, at 70.

"I'm assuming that's what the—*Paragraph 1* is what the objections are directed to, although they don't particularly say that, but the—it does require that a *special training program* be provided to *black employees* and the reason for that provision is to aid those persons who in the past have been denied movement into jobs that would *provide on-the-job training,* with *special training* so that they don't—so that they *are not limited to just those skills that they picked up i[n] the lower rated jobs,* but that *they can pick up skills that they have missed as a result of past decisions not to appoint them.* The evidence shows that to be a problem for black employees, not a problem important [to] white employees. And that's the reason that the *remedial training* is being given." [24]

None of the counsel present at the hearing took issue with this reading of ¶ 1 of article XVI as providing for substantive remedial training in skills, and it was based on this reading that the court approved consent decree I. [25]

The Special Master echoed this understanding of the department's obligations under article XVI in his findings that "the current system of on-the-job training ∴. is not calculated to provide the sort of training that is needed to overcome the effects of past racial discrimination in the Department of Transportation." [26] The Special Master did not recommend career path counseling for Sims, but rather that Sims receive "thorough training in the operation of all types of machinery as may be listed from time to time in the announcements of continuous merit system examinations as being required 'knowledge, skills and abilities', along with training in any other services described as being part of the 'kind of work' in such announcements." [27] The Special Master was, therefore, not talking about career path counseling; he was talking about substantive training in the "knowledge, skills, and abilities" denied African–Americans as a result of the department's past discrimination. [28] The department objected to neither these findings of fact nor this understanding of its obligations under article XVI.

Moreover, the department's reading of ¶ 1 of article XVI is impermissible under the canons of contractual construction. [29] Other provisions in consent decree I provide for career path counseling and training. For example, subsection 2(b) of article III provides in part that the Transportation "Department will develop and implement a program designed to achieve the following: ... Developing a procedure for informing employees regarding *career paths* within the Highway Department." [30] Subsections 2 and 3 of article X provide in part that the "Department will develop and disseminate to employees a written description of the in-house job titles and *career paths* available within the Highway Department and the merit system job classifications and Registers from which the jobs in each career path may be filled," and that, "Within 180 days of the effective date of the Decree, and thereafter on an annual basis, the Highway Department will— ... Conduct a supervisory management orientation program, open to all interested employees, for the purpose of explaining the management and supervisory positions in the Highway Department *career paths* and the duties and responsibilities of such jobs." [31]

In light of these other provisions in consent decree I expressly providing for career

---

24. *Id.* (emphasis added.)

25. Objections were lodged against ¶ 1 based on a concern that white employees could not enjoy its substantive benefits. It was made clear at the hearing that the "decree does not prohibit the Highway Department providing special training to white persons. It simply doesn't require them to do that." *Id.*

26. Doc. no. 1037 at 3–4.

27. *Id.* (emphasis added.)

28. *Id.* at 10.

29. A consent decree has the attributes of a contract and thus the rules of construction applicable to contracts apply where appropriate. *United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971).

30. Emphasis added.

31. Emphasis added.

path training, the department's limited reading of ¶ 1 of article XVI as also providing for such would render the paragraph superfluous. A cardinal rule of contractual construction is that, "Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous." Restatement (Second) of Contracts § 203(a) cmt. b (1979). *See also Muniz v. United States,* 972 F.2d 1304, 1319 (Fed.Cir.1992) ("A cardinal rule of contract interpretation requires that an interpretation which gives meaning to all parts of a contract will be preferred to one which leaves a portion of it useless, inoperative, meaningless or superfluous."); *cf. Mertens v. Hewitt Associates,* 508 U.S. 248, 113 S.Ct. 2063, 2069, 124 L.Ed.2d 161 (1993) ("We will not read the statute to render the modifier superfluous."); *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) ("courts should disfavor interpretations of statutes that render language superfluous."); *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 562, 110 S.Ct. 2126, 2132, 109 L.Ed.2d 588 (1990) (expressing "deep reluctance" to interpret statutory provisions "so as to render superfluous other provisions in the same enactment") (citation omitted).

The department's attempt to recast article XVI, and, in particular, ¶ 1 of the article, as obligating it to provide only career path counseling comes much too late. Without objection from the department, the court approved article XVI and the Special Master entered a recommendation, in both instances based on a reading of the department's obligations under the article as requiring aggressive and substantive affirmative-action training of African–American employees in needed knowledge, skills, and abilities.

█ The court therefore agrees with the plaintiffs that the Transportation Department's September 25 and 30 reports failed to comply with the June 26 orders. The first of the orders, as stated, required the department to submit a report containing "(a) a description of the temporary special training program for black employees, required by article XVI, ¶ 1; (b) a description of the

regular training courses to be offered to all employees, required by article XVI, ¶ 2; and (c) a description of the procedure for monitoring employee use of the training programs, required by article XVI, ¶ 2(c)." In its September 25 report, the department failed to mention, let alone describe, its obligations under ¶ 1 of article XVI to provide substantive remedial training in knowledge, skills, and abilities to its African–American employees. But more significantly, in its report, the department failed even to consider the careful findings of the Special Master, including that "the current system of on-the-job training ... is not calculated to provide the sort of training that is needed to overcome the effects of past racial discrimination in the Department of Transportation," and that, as to Sims in particular, the department has failed to provide the required substantive skills training in such areas as operation of equipment.[32] The department's September 25 report was not only cursory, it was arguably contemptuous of the Special Master's detailed and compelling findings of the department's failure to comply with article XVI and of the court's subsequent efforts to redress that failure department-wide.

The court recognizes that the department is now represented by a third and new set of attorneys. But these and other original understandings of provisions in consent decree I must be met, and the new attorneys have an obligation to become fully familiar with them.

### III. CONCLUSION

Finally, it is important to keep in mind that the court now has under submission two other proposed consent decrees containing "race-conscious" provisions, with which the Adams intervenors, and now even the department, take issue. Implementation of article XVI in the substantive and aggressive manner it requires would strongly draw into question the need for these so-called race-conscious provisions. And, on the other hand, the failure to do so would put in relief more strongly the need for the provisions. Therefore, all parties to this litigation—and,

**32.** Doc. no. 1037 at 3–4.

in particular, the department—should have a strong interest in the immediate and full implementation of article XVI. On this critical issue, the court will not let the department back peddle; and on this critical issue, the court will not relent.

Previously, the court declined to appoint a monitor to keep the court informed of the defendants' success and failure at compliance. The court may have to revisit the issue, however, should the Transportation Department continue to fail to meet its obligations under article XVI, a provision the court considers to be among those at the heart of consent decree I and critical to the eventual end of this litigation to the satisfaction of all.

Accordingly, for the above reasons, it is ORDERED that defendant Alabama Department of Transportation submit to the court by 4:00 p.m. on February 14, 1997, a supplemental report reflecting their plan for full and immediate compliance with article XVI of consent decree I, that is, their plan for aggressive and substantive affirmative action training of African–American employees in needed knowledge, skills, and abilities.