Johnny REYNOLDS, et al., Plaintiffs,

v.

**ALABAMA DEPARTMENT OF TRANSPORTATION, et al., Defendants.**

UNITED STATES of America, Plaintiff,

v.

**Halycon Vance BALLARD, et al., Defendants,**

Alabama State Conference of NAACP Branches, Amicus Curiae.

Civil Action Nos. 85–T–665–N, 2709–N.

United States District Court, M.D. Alabama, Northern Division.

Sept. 10, 1997.

Laurie Edelstein, Special Master, Rabinowitz, Boudin, Standard, Krinsky & Lienerman, P.C., New York City, pro se.

Winn S.L. Faulk, Special Master, Mobile, AL, pro se.

Leonard Gilbert Kendrick, Montgomery, AL, Richard J. Ebbinghouse, Robert L. Wiggins, Jr., Jon C. Goldfarb, Gregory O. Wiggins, C. Paige Williams, Rebecca Antho-

ny, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, Julian L. McPhillips, Jr., McPhillips, Shinbaum, Gill & Stoner, Montgomery, AL, Rick Harris, Glassroth & Associates, Montgomery, AL, for Johnny Reynolds, Cecil Parker, Frank Reed, Ouida Maxwell, Martha Ann Boleware, Peggy Vonsherie Allen, Jeffrey W. Brown.

Leonard Gilbert Kendrick, Montgomery, AL, Richard J. Ebbinghouse, Robert L. Wiggins, Jr., Jon C. Goldfarb, Gregory O. Wiggins, C. Paige Williams, Rebecca Anthony, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, Claudia H. Pearson, Longshore, Nakamura & Quinn, Birmingham, AL, Julian L. McPhillips, Jr., McPhillips, Shinbaum, Gill & Stoner, Montgomery, AL, Rick Harris, Glassroth & Associates, Montgomery, AL, for Robert Johnson.

Florence Belser, Montgomery, AL, pro se.

Raymond P. Fitzpatrick, Jr., David P. Whiteside, Jr., Whiteside & Fitzpatrick, Birmingham, AL, for William Adams, Cheryl Caine, Tim Colquitt, William Flowers, Wilson Folmar, George Kyser, Becky Pollard, Ronnie Pouncey, Terry Robinson, Tim Williams.

William K. Thomas, R. Taylor Abbot, Jr., Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, AL, Jeff Sessions, Attorney General, Office of the Attorney General, Montgomery, AL, Patrick H. Sims, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Mobile AL, for Gary Mack Roberts.

Bert S. Nettles, Lisa Wright Borden, London, Yancey, Elliott & Burgess, Birmingham, AL, William F. Gardner, William K. Thomas, R. Taylor Abbot, Jr., Cabaniss, Johnston, Gardner Dumas & O'Neal, Birmingham, AL, Jeff Sessions, Attorney General, Office of the Attorney General, Montgomery, AL, Patrick H. Sims, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Mobile, AL, for Halycon Vance Ballard, Department of Personnel, State of Alabama.

Bert S. Nettles, Lisa Wright Borden, London, Yancey, Elliott & Burgess, Birmingham, AL, William F. Gardner, William K. Thomas,

R. Taylor Abbot, Jr., Cabaniss, Johnston, Gardner Dumas & O'Neal, Birmingham, AL, Jeff Sessions, Attorney General, Office of the Attorney General, Montgomery, AL, Jack Franklin Norton, Alabama Department of Transportation, Legal Division, Montgomery, AL, Patrick H. Sims, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Mobile, AL, for Department of Transportation, State of Alabama.

William F. Gardner, William K. Thomas, R. Taylor Abbot, Jr., Cabaniss, Johnston, Gardner Dumas & O'Neal, Birmingham, AL, Jeff Sessions, Attorney General, Office of the Attorney General, Montgomery, AL, Patrick H. Sims, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Mobile, AL, for James E. Folsom, Jr.

### ORDER

MYRON H. THOMPSON, Chief Judge.

These two race-discrimination lawsuits are now before the court on a motion to stay filed in *Reynolds v. Alabama Department of Transportation*, civil action no. 85–T–665–N, on September 4, 1997, by defendants Alabama Department of Transportation, Alabama State Personnel Department and several State officials.[1] The issue presented is whether, as defendants contend, the impending resumption of trial, now set for September 15, 1997, should be stayed pending this court's resolution of their motion, filed on August 27, 1997, to dismiss plaintiffs' disparate-impact claims.[2] In their dismissal motion, defendants contend that, in providing for the imposition of disparate-impact liability on the States and their officials under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 1981a, 2000e through 2000e–17, the United States Congress exceeded its authority under the eleventh and fourteenth amendments to the United States Constitution. For the reasons that follow, the court concludes—based principally on three cases, one from the First Circuit Court of Appeals, another from the Sixth Circuit Court of Appeals, and another from the Seventh Circuit Court of Appeals—that the eleventh-hour stay motion should be denied as untimely.

### I. BACKGROUND

To put the defendants' stay and dismissal motions in their proper context—and, in particular, to show just how belated they are—it is necessary to review the relevant and salient aspects of the 12–year history of the *Reynolds* litigation that preceded the filing of the motions with the court:

*May 1985: Reynolds* was filed.[3] The plaintiffs charged the defendants with employment discrimination based on race in the Alabama Department of Transportation. The plaintiffs are African–Americans, and they represent a class of African–American merit and non-merit system employees and unsuccessful applicants. The defendants include the Transportation Department, the Personnel Department, and several State officials. The plaintiffs base this lawsuit on the following: Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17; the fourteenth amendment to the United States Constitution, as enforced by 42 U.S.C.A. § 1983; and 42 U.S.C.A. § 1981. The jurisdiction of the court has been invoked pursuant to 28 U.S.C.A. § 1343 and 42 U.S.C.A. § 2000e–5(f)(3).

*1985:* Answers filed over a period of time by defendants.[4]

*October 8, 1986:* The court entered an order certifying a plaintiff class as follows: (1) all black merit system employees employed by the Transportation Department at any time since May 21, 1979; (2) all black non-merit system employees of the depart-

---

1. Doc no. 2071.

2. Doc. no. 2063.

3. Doc. nos. 1, 36, 76, 78, 139, 264a, and 407.

4. Doc. nos. 10, 13–16, and 48–51.

ment who have unsuccessfully sought employment as merit system employees with the department at any time since May 21, 1979; and (3) all black non-employees who have unsuccessfully sought employment as merit system employees with the department at any time since May 21, 1979.[5] Subclasses (1) and (2) therefore consist of *employees* of the department and subclass (3) consists of *non-employees.*

*October 23, 1986:* First pretrial hearing held.

*October 31, 1986:* First pretrial order entered, and case set for trial on March 3, 1987.[6]

*February 18, 1987:* Order entered continuing the trial setting until June 8, 1987.[7]

*May 8, 1987:* Court informed that case is settled, and trial is continued generally.[8]

*September 21, 1987:* Case did not settle, and an order was entered resetting trial for February 29, 1988.[9]

*October 16, 1987:* Second pretrial conference held.

*November 5, 1987:* Second pretrial order entered, again stating that trial is set for February 29, 1988.[10]

*January 5, 1988:* Order entered continuing the trial setting until March 7, 1988.[11]

*January 21, 1988:* Order entered continuing the trial setting until June 13, 1988.[12]

*May 20, 1988:* Order entered continuing the trial setting until June 20, 1988.[13]

*1988:* The parties again reached full settlement of this case, and an order was entered on June 20, 1988, continuing trial in general,[14] but the court refused to approve the proposed consent decree in the face of numerous objections from the members of the plaintiff class. *Reynolds v. King,* 790 F.Supp. 1101 (M.D.Ala.1990).

*January 29, 1991:* Revised proposed settlement presented to court, and court provisionally approved it.[15]

*March 20, 1991:* Defendants exercised option to cancel revised proposed settlement.[16]

*April 10, 1991:* Order entered setting trial for September 16, 1991.[17]

*July 30, 1991:* Order entered setting trial for November 4, 1991.[18]

*October 4, 1991:* Third pretrial hearing held.

*October 7, 1991:* Third pretrial order entered,[19] and trial reset for January 2, 1992.[20]

*December 23, 1991:* Order entered continuing the trial setting until June 15, 1992,[21] on which date the trial began.

*1992:* The trial extended over several months, but ended before completion when the parties announced that they might be able to settle the litigation again.

*1993 and 1994:* The parties reached a second, albeit only partial, settlement, subse-

5.  Doc. no. 82.

6.  Doc. no. 92.

7.  Doc. no. 104.

8.  Doc. no. 115.

9.  Doc. no. 119.

10.  Doc. no. 122.

11.  Doc. no. 129.

12.  Doc. no. 132.

13.  Doc. no. 176.

14.  Doc. no. 182.

15.  Doc. no. 243.

16.  Doc. no. 260.

17.  Doc. no. 270.

18.  Doc. no. 321.

19.  Doc. no. 339.

20.  Doc. no. 339.

21.  Doc. no. 381.

quently embodied in three consent decrees. In the wake of this new settlement, the court allowed a group of non-class members—consisting mostly of white employees of the Department of Transportation and now commonly referred to as the "Adams intervenors"—to intervene and challenge any race-conscious provisions in the settlement. *Reynolds v. Roberts*, 846 F.Supp. 948 (M.D.Ala.1994).

*March 16, 1994:* The court approved one of the consent decrees, now known as consent decree I.[22] Consent decree I reaffirmed the certification of a plaintiff class, with subclasses, as set forth in the order of October 8, 1986. Most importantly, it provided for extensive and detailed class-wide relief. The two other proposed consent decrees are currently under the court's consideration.

One of the provisions of consent decree I, article XX, governed how the parties were to proceed in dealing with claims of individual class members. The article provided that, if further negotiations were unsuccessful, the trial was to recommence within 120 days of March 16 as to the "claims for monetary and non-monetary remedies for individual members of the class." The article states as follows:

"ARTICLE TWENTY

FURTHER PROCEEDINGS
REGARDING CLASS
MEMBERS

1. Further negotiations and proceedings are required to resolve the claims for monetary and non-monetary remedies for individual members of the class (including the named plaintiffs and intervenors), provided however, that this Decree does not in and of itself entitle any such class member to such remedies. Such claims shall be resolved first by settlement negotiations and then, to the extent not resolved by settlement negotiations, by the Court.

2. The parties will make all reasonable efforts to resolve all such claims of the members of the class (including the named plaintiffs and intervenors) according to a schedule to be mutually agreed upon within 10 days after preliminary approval of this Decree by the Court or, in the event the parties cannot mutually agree on such schedule within such 10 day period, the Court will enter an Order embodying a schedule. Regardless of whether the schedule is mutually agreed upon by the parties or embodied in an Order entered by the Court, such schedule shall contain specific deadlines for the exchange of information and for offers and counter-offers to enable settlement negotiations on such claims to take place within 90 days after the effective date of this Consent Decree and, in the event such settlement cannot be achieved, for trial on that phase of the case to commence no later than 180 days after the effective date of this Decree.

3. Such schedule shall be presented to the Court for approval or modification, and once finalized shall be entered as an Order of the Court. In the absence of agreement on such schedule within 10 days of the preliminary approval of this Decree, the Court will enter its own schedule aimed at settlement negotiations taking place within 90 days after the effective date of this Decree and scheduling that phase of the trial of this case to commence no later than 180 days after the effective date of this Decree."

*August 28, 1995:* The parties entered into a global settlement of the monetary claims of many of the class members.[23] The non-monetary claims remained unresolved.

*1995, 1996, and 1997:* The parties litigated numerous aspects of the August 28, 1995, settlement for monetary relief. *See, e.g., Reynolds v. Alabama Department of Transportation*, 955 F.Supp. 1428 (M.D.Ala.1997); *Reynolds v. Alabama Department of Transportation*, 926 F.Supp. 1077 (M.D.Ala.1996).

---

**22.** 1994 WL 899259 (M.D.Ala.1994); Doc. no. 553.

**23.** Doc. no. 726.

This litigation resulted in an order,[24] which is now on appeal. In tandem with this litigation, the parties also litigated defendants' extensive failure to comply with various substantive provisions—such as training, recruitment, and setting up promotion and hiring procedures—in the decree. *See, e.g., Reynolds v. Alabama Department of Transportation*, 972 F.Supp. 566, (M.D.Ala.1997); *Reynolds v. Alabama Department of Transportation*, 955 F.Supp. 1441 (M.D.Ala.1997); *Reynolds v. Alabama Department of Transportation*, 1996 WL 420834 (M.D.Ala. April 23, 1996). This aspect of the litigation has also resulted in an order, which is now on appeal.[25]

*August 2, 1995:* In anticipation of the resumption of trial (although not within the 120 days required by the consent decree and thus belatedly), defendants filed Rule 52 motions for judgment as a matter of law on the individual claims remaining from the 1992 trial but for which trial would now have to resume.[26]

*September 7, 1995:* Order entered setting trial for May 13, 1996.[27]

*September 26, 1995:* Order entered denying Rule 52 motions.[28]

*April 23, 1996:* Order entered setting trial to resume on May 13, 1996.[29]

*May 2, 1996:* Order entered continuing the trial setting until June 3, 1996.[30]

*May 24, 1996:* Order entered continuing the trial setting until August 19, 1996.[31]

*August 27, 1996:* Order entered continuing the trial setting until December 9, 1996.[32]

*November 8, 1996:* Fourth pretrial conference held.

*November 19, 1996:* Fourth pretrial order entered, restating case is set for trial on December 9, 1996.[33]

*December 9, 1996:* Order entered continuing the trial setting until December 18, 1996.[34]

*December 20, 1996:* Order entered continuing trial to a date to set later.[35]

*March 26, 1997:* Order entered continuing the trial setting until July 2, 1997.[36]

*April 15, 1997:* Defendants filed a motion asking to amend their answer to assert for the first time, after 12 years of litigation, an eleventh-amendment defense.[37]

*May 19, 1997:* Defendants filed a motion asking for clarification of burden of proof in their favor or for continuance of upcoming trial.[38]

*May 21, 1997:* Over the vigorous objection of plaintiffs, an order was entered granting the defendants permission to amend their answer,[39] and the defendants filed an amendment to their answer asserting eleventh amendment immunity from liability under any theory of discrimination that does not

24. Doc. no. 1785.

25. Doc. no. 1760.

26. Doc. nos. 688–694.

27. Doc. no. 734.

28. Doc. no. 773.

29. Doc. no. 988.

30. Doc. no. 1003.

31. Doc. no. 1036.

32. Doc. no. 1212.

33. Doc. no. 1333.

34. Doc. no. 1419.

35. Doc. no. 1447.

36. Doc. no. 1707.

37. Doc. no. 1777.

38. Doc. no. 1874.

39. Doc. no. 1879.

require proof of intentional deprivation of rights, including disparate-impact claims.[40]

*June 25, 1997:* Order entered continuing the trial setting to the current trial date, September 15, 1997.[41]

*August 27, 1997:* Less than 20 days before trial, defendants filed a motion to dismiss disparate-impact claims asserting that they are immune from liability under any theory of discrimination that does not require proof of intentional deprivation of rights, and that Congress's attempt to impose such liability on States is an invalid exercise of its power under the fourteenth amendment.[42]

*September 2, 1997:* The Adams intervenors filed a motion to dismiss disparate-impact claims,[43] which incorporated by reference the arguments made in defendants' August 27, 1997, motion.[44]

*September 3, 1997:* During a telephone conference between the court, parties, and the United States, defense counsel indicated that they needed 30 days to brief the dismissal motion and thus could not brief it before trial. They indicated that they would file a motion to stay the trial. The court ordered an expedited filing of any stay motion because of the impending trial.

*September 4, 1997:* The defendants filed their motion for stay of trial proceedings[45] and memorandum in support of motion for stay.[46]

*September 4, 1997:* Order entered setting dismissal motion for submission on October 21, 1997, with defendants to file their brief by September 30, 1997, as they requested, and plaintiffs to do the same by October 21, 1997.[47]

## II. DISCUSSION

It is apparent from this extended history (four pretrial hearings, a partial trial lasting several months, a partial but extensive settlement, numerous continuances of the resumption of trial, and extensive litigation over related issues) that defendants' dismissal and stay motions (which come only days before trial resumes and thus, by their own admission, were filed too late even to be briefed by them (let alone by the other parties) and resolved before trial resumes) are not just belated, they are grossly so. However, this conclusion, while compelling, is not dispositive of the issue before the court: whether the upcoming proceeding, now set for September 15, 1997, should be stayed pending resolution of the immunity question. For, "[T]he Eleventh Amendment bars a citizen from bringing suit against the citizen's own State in federal court." *Welch v. State Dep't of Highways and Pub. Transp.*, 483 U.S. 468, 472, 107 S.Ct. 2941, 2945, 97 L.Ed.2d 389 (1987). This principle holds true except where a State waives its immunity from suit, an act that requires express language by the State or overwhelming implication from its actions, or where the State's immunity is abrogated by Congress under its power granted in § 5 of the fourteenth amendment to the United States Constitution. *Id.* at 473–744, 107 S.Ct. at 2946. By their motion to dismiss disparate-impact claims, defendants are attempting to reclaim this shield in an area where it was previously thought to have been abrogated by Congress. Their motion is a direct challenge to Congress's creation of disparate-impact in Title VII, claiming that Congress exceeded its power under the fourteenth amendment when it extended the Act's coverage to include holding States liable for discrimination that does not require proof of intent, an argument that is, to the best of the court's knowledge, novel.

The question before this court is how to pay appropriate homage to this important

---

**40.** Doc. no. 1880.

**41.** Order dated Doc. no. 1961.

**42.** Doc. no. 2063.

**43.** Doc. no. 2066.

**44.** Doc. no. 2063.

**45.** Doc. no. 2071.

**46.** Doc. no. 2072.

**47.** Doc. no. 2070.

constitutional defense, while at the same time allowing for the orderly and expeditious progress of cases to trial, something in which not only the litigants, but also the public, has an interest. At least three Courts of Appeals have expressly addressed this concern.

### A.

In *Kennedy v. City of Cleveland,* 797 F.2d 297 (1986), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987), the Sixth Circuit Court of Appeals was confronted with a belated assertion of immunity not to go to trial. The court succinctly summarized the governing principle: "The *quid pro quo* is obvious: in exchange for the defendant's right to interrupt judicial process, the court may expect a reasonable modicum of diligence in the exercise of that right." 797 F.2d at 301. In reaching this conclusion, the court reasoned as follows.

The court acknowledged that eleventh-amendment immunity, as with all types of immunity, is multi-faceted. "[A]bsolute … immunity, once established, not only protects the holder against ultimate personal liability in damages but also from the onerous burdens of defense in much the same way that the Double Jeopardy Clause and the Speech and Debate Clause afford immunity from prosecution." *Id.* at 298; *see also Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 145, 113 S.Ct. 684, 688, 121 L.Ed.2d 605 (1993) ("[V]alue to the States of their Eleventh Amendment immunity, like the benefit conferred by qualified immunity to individual officials, is for the most part lost as litigation proceeds past motion practice."). Thus, eleventh-amendment immunity has at least two facets: im-

munity from liability and immunity from going to trial at all. Here, in the two cases now before this court, the latter immunity from trial is the basis on which the defendants rest their motion for a stay. They contend that they will effectively lose their eleventh-amendment immunity if they are forced to go to trial.

The Sixth Circuit added, however, that eleventh-amendment immunity was not jurisdictional, but rather could be waived if not timely asserted. The court explained: "[N]either absolute nor qualified immunity is recognized so much as a matter of inherent right in the person claiming it as it is the result of the application of historical principles which reflect a proper balance between the protection of the rights of individuals to be free from constitutionally violative harm and the very real need of persons charged with governmental duties to get on with its business without harassment or intimidation. [The] immunity, whether qualified or absolute, is an affirmative defense which must be affirmatively pleaded; it is not a doctrine of jurisdictional nature that deprives a court of the power to adjudicate a claim." *Kennedy,* 797 F.2d at 300 (*citing Mitchell v. Forsyth,* 472 U.S. 511, 527–28, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985); *Gomez v. Toledo,* 446 U.S. 635, 640–41, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980); *Harlow v. Fitzgerald,* 457 U.S. 800, 815 n. 24, 102 S.Ct. 2727, 2736 n. 24, 73 L.Ed.2d 396 (1982)). "Since immunity must be affirmatively pleaded, it follows that failure to do so can work a waiver of the defense." *Id.*[48]

The court then clarified that because eleventh-amendment immunity has at least two

---

48. Eleventh-amendment immunity does "partake of the nature" of a jurisdictional bar in the sense that it can be raised at any time by defendant, *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974), and, if raised properly raised, can even deprive a court of the authority to hear an issue. *Pennhurst State Sch. Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). But it differs from jurisdiction in the sense that it is still an affirmative defense which must be raised by the defendant and thus can be waived. In other

words, unlike jurisdiction, it can be waived and a court cannot on its own raise the defense. *Patsy v. Board of Regents of the State of Fla.,* 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172 (1982) ("[B]ecause of the importance of State law in analyzing Eleventh Amendment questions and because the State may, under certain circumstances, waive this defense, we have never held that [eleventh amendment immunity] is jurisdictional in the sense that it must be raised and decided by this Court on its own motion.")

aspects—the right to be shielded from damages and the right not to go to trial—"the interests are procedurally distinct," such that "the failure to plead immunity may, at different stages of the litigation, work either a partial or complete waiver." *Id.* "Hence, . . . it is possible that one might assert immunity as an affirmative defense to the complaint and thus as an affirmative defense to ultimate liability without putting in issue his or her right to be free of subjection to trial or, before that, to the burdens of discovery." *Id.* Therefore, the court concluded that trial immunity "is one which can be lost by failure timely to assert it," and, in particular, can be subjected to the authority of a trial judge "to maintain control of his docket and to assure the expeditious advancement of cases." *Id.*

Because of these potentially conflicting concerns—the right to assert immunity not to go to trial at all *and the authority of the trial court to manage a case*—the appellate court then emphasized the need for the early and expeditious resolution of immunity issues. *Id.* at 299; *see also Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144, 113 S.Ct. 684, 687, 121 L.Ed.2d 605 (1993). It is not only disruptive to the orderly preparation of a case for trial, it can be a tremendous waste of private and public resources for a defendant to allow opposing parties and the court to go through time-consuming and expensive trial preparations, only to assert at the last minute a right not to go trial at all. The least a defendant asserting the defense owes to everyone else is an early presentation of the trial-immunity defense.

Applying the above principle—"a reasonable modicum of diligence in the exercise of [trial-immunity] right," *Kennedy* at 301—the Sixth Circuit then concluded, after an extensive review of the proceedings in the trial court (similar to one this court has made of the *Reynolds* litigation), that the defendants' abusive delay waived their immunity from trial, though not their immunity from liability. *Id.* at 301–06.

### B.

In *Apostol v. Gallion,* 870 F.2d 1335 (1989), the Seventh Circuit Court of Appeals wrestled with the same tension between the importance of resolving an immunity claim early on and the trial court's power to proceed with its resolution of the case. There, the defense was one of qualified immunity, and the posture of the case was slightly different in that the parties had already received a ruling on their qualified-immunity defense and were seeking a stay pending appeal. Nevertheless, the Seventh Circuit was confronted, as is this trial court, with a concern that the defense was being raised belatedly. The court, speaking through Judge Easterbrook, cautioned trial courts that, "Defendants may seek to stall because they gain from delay at plaintiffs' expense, an incentive yielding unjustified appeals. Defendants may take [automatic interlocutory appeals taken from denial of claims of qualified immunity] for tactical as well as strategic reasons: disappointed by the denial of a continuance, they may help themselves to a postponement by lodging a notice of appeal. Proceedings masquerading as [automatic interlocutory appeals taken from denial of claims of qualified immunity] but in fact not presenting genuine claims of immunity create still further problems." 870 F.2d at 1338–39. The court observed that such shenanigans "may injure the legitimate interests of other litigants and the judicial system." *Id.* at 1338.

Confronted with such, the appellate court continued, trial courts "are not helpless in the face of manipulation." *Id.* at 1339. "If [defendants] wait too long after the denial of summary judgment, or if they use claims of immunity in a manipulative fashion, they surrender any entitlement to obtain an appellate decision before trial. This is not to say that they lose the right to contend on appeal from the final judgment that they enjoy immunity from damages; the right not to pay damages and the right to avoid trial are distinct aspects of immunity, and the former may be raised on appeal at the end of the case even if defendants bypass their right to appeal . . . before trial." *Id.* In other words, "defendants who play games with the district court's schedule forfeit their entitlement to a

pre-trial appeal. A district court may certify that a defendant has surrendered the entitlement to a pre-trial appeal and proceed with trial." *Id.*

### C.

Finally, in *Guzman–Rivera v. Rivera–Cruz*, 98 F.3d 664 (1996), the First Circuit confronted an untimely trial immunity defense. As in the *Reynolds* case, the defendant there waited far into the litigation, even after the pretrial order, to assert the defense. Although the defense at issue was for qualified immunity, the court's observations are still applicable. The court wrote: "[D]efendants raised the qualified immunity defense very late in the pre-trial, post-discovery phase, despite the fact that they had ample opportunity to have the issue resolved expeditiously earlier in the proceedings, rather than generating additional delay by filing this third motion for summary judgment." 98 F.3d at 668. The court then defined the issue as "whether the defendants waived the right to raise the defense at this stage by failing to do so in a diligent manner and by failing to offer an explanation for the delay." *Id.* The court then concluded that, "[T]he defense of qualified immunity [has] been waived for the current stage of the litigation: the defense has been available to defendants since early in the litigation and, as the district court correctly found, the plaintiff has been prejudiced by the defendants' intentional strategy of delay."[49]

### D.

Here, with regard to the upcoming resumption of trial on September 15, it is not even a close call that defendants have failed to exercise "a reasonable modicum of dili-

gence in the exercise of [trial immunity]," *Kennedy*, 797 F.2d at 301, and thus have forfeited their right to trial immunity. For the following reasons, their failure far exceeds the circumstances presented in even *Kennedy* and other cases where a waiver has been found:

● Defendants filed their initial answers in 1985. But not until twelve years later did they seek to amend their answer to assert the eleventh-amendment immunity defense they now seek to assert.

● Four pretrial hearings have been held, and four pretrial orders entered. But at none of these hearings and in none of these orders did defendants contend that the trial needed to be continued in order to resolve an eleventh-amendment immunity defense.

● This case has even been partially settled on the issue of monetary relief, and not once did defendants assert they were entitled to eleventh-amendment immunity of the type asserted today.

● In anticipation of the resumption of trial, defendants filed many Rule 52 motions for judgment as a matter of law, but failed in any of them to assert eleventh-amendment immunity of the type asserted today, including immunity from resumption of trial.

● The 1994 consent decree, which was executed by defendants, expressly provides for the resumption of trial, indeed within 180 days after the entry of the decree. The decree does not provide for any continuance—or any appeal—based on an assertion of any trial immunity.

● The impact of granting the motion to stay is also significant. In writing this order, the court finds itself within one week of trial, a trial that is projected to last many months. In fact, the court has already set aside over

---

49. The First Circuit also noted that its decision "does not imply, however, that the defense has been waived for other stages of the litigation. Because the defense of qualified immunity may be raised and appealed at multiple stages of the trial, it would be inappropriate to find waiver for all stages in the current case." 98 F.3d at 669.

In a similar vein here, this court only holds that defendants have waived trial immunity for the upcoming resumption of trial; the court does not have before it and, thus, does not address whether they have waived trial immunity as to any other proceeding.

40 trial days.[50] But more importantly, the plaintiffs and the Adams intervenors have engaged in significant preparation for this trial. Witnesses, including expert witnesses, are now ready to testify. Staying the trial at this late date would work a significant hardship on the parties.

• On a practical level, beyond the seeming manipulation as a result of defendants' timing of the filing of their motions, their need for a stay of trial seems to have little import here and really seems unnecessary. First, unlike assertion of immunity claims in many other cases, defendants will be going to trial in this case anyway. Success on their motion to reclaim immunity will not make them immune from trial altogether, and if plaintiffs' contentions are correct—because State official are named as co-defendants, and they are not immune from injunctive relief—the defendants will have to present the same evidence they would have had to present anyway. Unlike many other cases, success on the immunity claim certainly will not keep the defendants from going to trial at all, and may not even limit the trial on any of the claims.

• Finally and most critically, defendants waited until 19 days before trial was to resume, knowing, as admitted during a September 3 telephone conference, that they needed at least 30 days to brief the eleventh-amendment immunity issue. Defendants did this despite the fact that the court allowed them back in May 1997 to amend their answers to assert a belated eleventh-amendment immunity defense. Defendants offer

no excuse for waiting from May until late August and September to present the issue to the court for briefing and resolution, they offer no excuse for waiting five years after the recess of the first trial and three years after entry of the consent decree to present this issue to court only 19 days before resumption of trial, and they offer no excuse for waiting over a decade after this case was first filed to raise the defense at all.[51]

If this case is not one in which a defendant has forfeited its eleventh-amendment trial immunity, then the right simply cannot be forfeited at all. The court will therefore enter an order denying the stay motion. In addition, to allay any jurisdictional concerns, as suggested by the Seventh Circuit in *Apostol*, this court will formally certify that trial immunity was waived and that its extremely belated assertion is frivolous. The court notes, however, that this decision has no impact on the defendants' continued right to assert their claim of eleventh-amendment immunity from judgment.[52]

## III. CONCLUSION

For the foregoing reasons, it is ORDERED that defendants' motion for stay of trial proceedings, filed on September 4, 1997 (Doc. no. 2071), is denied.

It is further CERTIFIED that trial immunity under the eleventh amendment has been waived and its extremely belated assertion is frivolous.

---

**50.** The court must candidly admit that, with its current heavy docket, it could take up other matters during this period in the absence of the trial.

**51.** Defendants imply that a change in the law has warranted the delay on the assertion of the defense. They point to the Supreme Court's decision *Seminole Tribe v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). This decision was handed down in March 1996, and defendants offer no explanation as to why they waited over a year after the decision, to almost the eve of the resumption of trial, to seek a pretrial ruling from the court. More important-

ly, *Seminole* has been the law of the Eleventh Circuit since January 1994, *Seminole Tribe v. Florida*, 11 F.3d 1016 (11th Cir.1994), three months before entry of the 1994 consent decree, and defendants have offered no explanation for this three-year delay and, in particular, why they did not raise the issue at the time of the consent decree. Finally, the arguments made in *Seminole* are reported in cases as early as 1991, *see, e.g., Poarch Band of Creek Indians v. Alabama*, 776 F.Supp. 550 (S.D.Ala.1991), and defendants offer no reason as to why they could not have presented the issue to this court back then, if not earlier.

**52.** *See also supra* note 49.