Johnny REYNOLDS, et al., Plaintiffs,

v.

ALABAMA DEPARTMENT OF TRANSPORTATION, et al., Defendants.

Civil Action No. 85–T–665–N.

United States District Court,
M.D. Alabama,
Northern Division.

April 13, 1998.

Robert L. Wiggins, Jr., Ann K. Wiggins, Russell W. Adams, Abigail P. Van Alstyne, Kimberly C. Page, Scott Gilliland, and Kell A. Simon, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Johnny Reynolds, plaintiff, and Cecil Parker, Frank Reed, Ouida Maxwell, Martha Ann Boleware, Florence Belser, Peggy Vonsherie Allen, and Jeffrey W. Brown, intervenor-plaintiffs.

Claudia H. Pearson, Nakamura & Quinn, Birmingham, AL, for Robert Johnson, intervenor-plaintiff.

Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for William Adams, Cheryl Caine, Tim Colquitt, William Flowers, Wilson Folmar, George Kyser, Becky Pollard, Ronnie Pouncey, Terry Robinson, Tim Williams, intervenors.

Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for Michael Grant, John D'Arville, and Andrew McCullough, intervenors.

Thomas R. Elliot, Jr., Allen R. Trippeer, Jr., Lisa W. Borden, C. Dennis Hughes, London & Yancey, Birmingham, AL, and William H. Pryor, Jr., Atty. Gen. for the State of Alabama, Montgomery, AL, for Alabama. Dept. of Transp., Alabama State Personnel Dept., Jimmy Butts, in his official capacity as Director for Alabama Dept. of Transp., Halycon Vance Ballard, in her official capacity as Director of the Alabama State Personnel Dept., and Fob James, in his official capacity as Governor of the state of AL, defendants.

William P. Gray, Jr., Gray & Jauregui, Montgomery, AL, for Fob James, in his official capacity as Governor of the State of Alabama, defendant.

Elaine R. Jones, Norman J. Chachkin, NAACP Legal Defense Fund, New York, NY, for NAACP Legal Defense and Educational Fund, Inc., amicus.

Barbara R. Arnwine, Thomas J. Henderson, Richard T. Seymour, Teresa A. Ferrante, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for The Lawyers' Committee for Civil Rights under Law, amicus.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

This long-standing class-action litigation, in which defendant Alabama Department of Transportation is charged with racial discrimination in employment against African–Americans, is currently before the court on plaintiff Johnny Reynolds's claims that the Transportation Department suspended him from his job[1] in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17.[2] Reynolds claims that his suspension is illegal because it was, first, based on his race, and, second, in retaliation for protected conduct. For the reasons that follow, and based on the evidence presented during a 1996 trial, the court finds in favor of Reynolds on his claims.

## I. PROCEDURAL BACKGROUND

This lawsuit was initiated in May 1985 by Reynolds and several other plaintiffs on behalf of a class of African–American merit and non-merit system employees. The plaintiffs charged the Department of Transportation and other defendants with race discrimination in violation of Title VII and other federal laws. In 1988, the parties reached a full settlement of this case, but the court refused to approve the proposed consent decree in

---

**1.** These claims are contained in the plaintiffs' motion for preliminary injunction, filed March 18, 1996 (Doc. no. 961). By agreement of the parties, the motion for preliminary injunction was treated as a motion for permanent injunction. *See* order, entered April 4, 1996 (Doc. no. 976).

**2.** The lawsuit, including Reynolds's claims, also rests on the equal protection clause of the fourteenth amendment to the United States Constitution, as enforced by 42 U.S.C.A. § 1983, and on 42 U.S.C.A. § 1981. Reynolds also rests his claims on a 1994 consent decree in this case. *See infra* note 3. Because the defendants have not questioned the propriety of Reynolds's reliance on Title VII and because adequate relief is available under Title VII, the court need not discuss in detail the other bases for Reynolds's claims—although Reynolds would clearly be entitled to recover on these other bases as well.

the face of numerous objections from the members of the plaintiff class. *See Reynolds v. King*, 790 F.Supp. 1101 (M.D.Ala.1990). Following a trial in 1992, which spanned over a six-month period and ended with the presentation of only part of the plaintiffs' case, the parties reached a second, albeit only partial, settlement, subsequently embodied in three consent decrees. In the wake of this new settlement, the court allowed a group of non-class members—consisting predominantly of white employees of the department, and now commonly referred to as the 'Adams intervenors'—to intervene and challenge any race-conscious provisions in the settlement. *See Reynolds v. Roberts*, 846 F.Supp. 948 (M.D.Ala.1994). One of the consent decrees was approved by the court on March 16, 1994, and is now commonly referred to as 'consent decree I.'[3] The two others are currently under the court's consideration.

Since then, and over the last four years, the parties and the court have been actively and extensively involved in the implementation of consent decree I. *See, e.g., Reynolds v. Alabama Dep't of Transp.*, 996 F.Supp. 1156 (M.D.Ala.1998); *Reynolds v. Alabama Dep't of Transp.*, 996 F.Supp. 1130 (M.D.Ala. 1998); *Reynolds v. Alabama Dep't of Transp.*, 996 F.Supp. 1118 (M.D.Ala.1998); *Reynolds v. Alabama Dep't of Transp.*, 976 F.Supp. 1431 (M.D.Ala.1997); *Reynolds v. Alabama Dep't of Transp.*, 972 F.Supp. 566 (M.D.Ala.1997); *Reynolds v. Alabama Dep't of Transp.*, 955 F.Supp. 1428 (M.D.Ala.1997); *Reynolds v. Alabama Dep't of Transp.*, 955 F.Supp. 1441 (M.D.Ala.1997); *Reynolds v. Roberts*, 1996 WL 378271 (M.D.Ala. June 7, 1996); *Reynolds v. Alabama Dep't of Transp.*, 1996 WL 420834 (M.D.Ala. Apr.23, 1996); *Reynolds v. Alabama Dep't of Transp.*, 926 F.Supp. 1077 (M.D.Ala.1996); *Reynolds v. Alabama Dep't of Transp.*, 926 F.Supp. 1448 (M.D.Ala.1995).

## II. EVIDENTIARY BACKGROUND

As stated, this case is before the court on Reynolds's claim that the Department of Transportation illegally suspended him.

### A.

The department's personnel structure is, in part, as follows:

---

3. *See Reynolds v. Alabama Dep't of Transp.*, 1994 WL 899259 (M.D.Ala. Mar.16, 1994) (Doc. no. 553).

Alabama Department of Transportation

Jimmy Butts
Director

J.A. Pennington
Assistant Director

Ray Bass
Chief Engineer

Don Arkle
Bureau Chief, Design Bureau

Rex Bush
Roadway Design Engineer

Nelson Reese
Assistant
Roadway
Design
Engineer

Robert Lee
Assistant
Roadway
Design
Engineer

John
Wiggins
Section
Leader

George
Jones
Section
Leader

Charles
Lett
Squad
Leader

Thomas 'Wes'
Jordan
Squad
Leader

George
Chapman
Squad
Leader

Warren
Carlisle
Designer

Keith
Gibson
Designer

Edith
Fortner
Designer

Brett
Scott
Designer

Johnny
Reynolds
Designer

The employees from the Charles Lett and Thomas Jordan squads all work in an open room divided into twelve cubicles, which are in the middle of the room. Because the cubicle walls do not extend to the ceiling, it is possible for a person working at one cubicle to hear a conversation taking place at another. Along one end of the room are several long tables used for drafting. The tables stand between the work area and a copy room. The wall adjacent to the table wall is lined with windows. In front of the windows is a space at which employees sometimes gather to spread out large maps or construction plans.

A group of white employees, often including Lett, Jordan, Brett Scott, Warren Carlisle, and Keith Gibson, and sometimes including white employees from other sections, frequently met at the windows to work together.[4] Lett and Jordan are both supervisors. During these informal meetings they often talked about Reynolds and this lawsuit. Lett (and possibly others) believed that he had not received a promotion because of Reynolds and the lawsuit.[5] Also during the informal meetings, Lett, Jordan, and others often told racially derogatory jokes and referred to black people as "niggers" or "black boys." [6] Before telling such jokes or using racial slurs, the white employees looked around to see if any black employees were within earshot. If not, they proceeded with their jokes.[7] Although they seemed to assume that no white employee would be offended by such language, Scott was offended.[8] Scott went to Jessie Smith, a black employee of the department, to ask him why Reynolds continued to be friends with Lett because Lett used racial slurs, talked disparagingly about the lawsuit, and talked about Reynolds behind his back.[9] Scott told Smith that Lett, Jordan, and the other white employees who gathered at the windows to talk, used the word "nigger" in their conversations,[10] talked about Reynolds behind his back, and blamed Reynolds and the consent decree for the freeze on promotions.[11] Further, Scott told Smith and Craig Thomas,

another black employee, that Lett bragged that Reynolds gave Lett information about the lawsuit before he gave it to members of the plaintiff class.[12]

Scott also went to Reynolds and told him that Lett talked about him behind his back.[13] In addition, Smith and Thomas both told Reynolds several times that they did not approve of his practice of sharing information about the lawsuit with Lett, and that he should stay away from Lett because Lett only pretended to like Reynolds. In addition, they told Reynolds that Lett used racial slurs.[14]

On February 26, 1996, after many discussions with Smith, Thomas, and Scott, Reynolds approached Lett in the Roadway Design area near the work tables adjacent to the copy room. Reynolds told Lett that he should be careful what he said in front of Scott.[15] Reynolds said that Scott had told Smith and Thomas that Lett had talked about Reynolds behind his back, complained that Reynolds and his lawsuit had cost him a promotion, and used racial slurs behind Reynolds's back.[16] Reynolds said that he was feeling pressure from Smith and Thomas because they did not like Reynolds's practice of giving court documents to Lett before he shared them with members of the plaintiff class.[17] To lessen the pressure on him from black employees, Reynolds asked Lett to stop telling people this and talking about him. Finally, Reynolds asked Lett if Lett

4. *See* testimony of Brett Scott, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 40.

5. *See id.* at 59.

6. *See id.* at 34.

7. *See id.* at 28.

8. *See id.* at 26.

9. *See id.* at 25.

10. *See id.* at 205, 210.

11. *See id.* at 35–36.

12. *See* testimony of Jessie Smith, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 231.

13. *See* testimony of Brett Scott, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 12.

14. *See* testimony of Jessie Smith, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 231–32, 234.

15. *See* testimony of Charles Lett, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 148.

16. *See* testimony of Johnny Reynolds, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 664; testimony of Charles Lett, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 149–51.

17. *See* testimony of Charles Lett, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 151.

had ever called Reynolds a "nigger," and indicated that Scott had said that Lett had done so in a conversation with Scott about promotions.[18] Lett told Reynolds that he had not talked about him behind his back and denied having called him a "nigger."[19] The entire conversation was cordial and neither man raised his voice or otherwise displayed any anger.[20]

After Lett's conversation with Reynolds ended sometime between 3:30 and 4:00 p.m.,[21] Lett tried and failed to find Scott, and he went to speak to John Wiggins, his immediate supervisor, to report the incident with Reynolds. Because Wiggins was out of the office, Lett went to see Nelson Reese, Wiggins's supervisor, to tell him about the situation. Because Lett was calm and did not seem angry as he described his conversation with Reynolds, Reese did not suspect that Lett was angry or that he intended to retaliate against Scott.[22]

On the morning of February 27, 1996, Lett confronted Scott in the Roadway Design area near the windows. Lett was very agitated and asked Scott if he had told Reynolds that Lett had called Reynolds a "nigger."[23] Lett stated that Scott was "toting an ass whooping," and that, if he had caught up with Scott the previous afternoon, he would have "taken [his] head off with a straight edge," a piece of metal approximately 36 inches long and four inches wide used to draw straight lines.[24]

Lett said that Scott could file a complaint with the equal employment opportunity office if he wanted to, but once the complaint was disposed of, Lett would "whip his ass."[25] Scott did not respond to Lett's threats, and eventually Jordan stepped between the two men.[26] Scott took Lett's comments as a "physical threat on his life."[27]

Scott reported the incident to Don Arkle, Chief of the Design Bureau, and Arkle told him to inform Rex Bush, who was the Roadway Design Engineer and Arkle's immediate subordinate. Because Bush was out of the office, Scott went back to Arkle, who told Scott that he would take care of the problem. Arkle did not ask Scott any questions, and Reynolds's name did not come up during the conversation.[28] Scott later met with Lett, Wiggins, and Reese to discuss the incident. At this meeting, Lett brought up a court document regarding promotions that Reynolds had given to Lett and Lett had discussed with Scott.[29] Lett told Scott that Reynolds's reference to this document was proof that Scott had told Reynolds what Lett and Scott had discussed.[30]

Wiggins reported on the situation to Arkle, and recommended that Lett be suspended without pay for two weeks, that Scott be transferred to another section, and that Reynolds be fired if it was determined that he had spread a false and malicious rumor.[31]

**18.** *See id.* at 152.

**19.** *See id.*

**20.** *See id.*

**21.** *See id.* at 153.

**22.** *See id.* at 153–54.

**23.** *See id.* at 175–176; testimony of Brett Scott, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 61–63.

**24.** Testimony of Brett Scott, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 61–63; testimony of Charles Lett, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 159.

**25.** Testimony of Charles Lett, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 180.

**26.** *See* testimony of Brett Scott, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 62.

**27.** *See id.* at 62–63.

**28.** *See id.* at 65–66.

**29.** The document was the parties' joint report concerning status of provisional appointment negotiations, filed February 16, 1996 (Doc. no. 939), also designated as plaintiffs' exhibit 2, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

**30.** *See* testimony of Brett Scott, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 67–70.

**31.** *See* exhibit 10B, March 115 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

By this time, the investigation had shifted from looking into the altercation between Lett and Scott to looking into whether Reynolds had incited the altercation between Lett and Scott. Chief Engineer Ray Bass, Arkle's supervisor, asked J.B. Fowler to take over the investigation.[32] Fowler, a former police officer, is executive assistant to the Director of the Transportation Department, Jimmy Butts.[33]

The investigation Fowler conducted was the first of its kind in the history of the department. He interviewed and took statements from ten people: Carlisle, Gibson, Jordan, Lett, Reese, Reynolds, Scott, Smith, Thomas, and Wiggins. All of the witnesses except Reynolds were allowed to tell Fowler in their own words what they knew about the situation. In contrast, Fowler presented Reynolds with a list of yes-and-no questions, and demanded that Reynolds circle either 'yes' or 'no' to each question. He refused to allow Reynolds to explain or qualify his answers.[34] As discussed above, many of the witnesses told Fowler that racial slurs were commonly used in Roadway Design, but Fowler was interested only in Reynolds's conduct.[35]

After Fowler completed his investigation, Arkle reviewed the statements and concluded that Reynolds had maliciously made a misstatement of fact that was racially sensitive and caused harm to fellow employees.[36] He then met with Butts, Bass, Fowler, Marvin Wagoner (Director of the Personnel Bureau), Jack Norton (the department's in-house counsel), and Jack Caraway (Bass's assistant) to discuss Reynolds's suspension.[37] Arkle recommended that Reynolds be suspended without pay two weeks, and the group agreed with his recommendation. Those present at the meeting could not recall another situation exactly like the one involving Lett, Scott, and Reynolds. The only other specific case discussed at the meeting was an incident involving Eddie Lester, a white employee, who called a black employee a "nigger" and threatened to kill him.[38] Lester was suspended for two weeks. As a group, they agreed with Arkle's recommendation of a two-week suspension.[39]

At the meeting and in his subsequent letter to Reynolds, dated March 6, 1996, Arkle gave several reasons for recommending Reynolds's suspension:

First, Arkle found that Reynolds had made false statements involving racial slurs which created a disruption in the office.

Second, Arkle indicated that Reynolds had "committed acts of insubordination" by refusing to cooperate during the investigation.[40]

And third, Arkle found that Reynolds had violated the department's 'June 1995 memorandum,' which prohibits the making of false statements during an investigation into a charge of racial harassment.[41]

32. *See* testimony of Jimmy Butts, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 772–73.

33. *See id.*

34. *See* questions, plaintiffs' exhibit 23, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996; transcript of interview with Reynolds, taken March 1, 1996, exhibit 18, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

35. *See* testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 355.

36. *See id.* at 324–25.

37. *See id.* at 419.

38. *See id.* at 416–20, 422.

39. *See id.* at 420. During the 1992 partial trial, Reynolds credibly testified that he had known Bass and Caraway for some time, and that they had threatened to fire him if he attempted to date white women. Caraway told Reynolds that it made him "sick" for black men to work with white women. *See* testimony of Johnny Reynolds, transcript of 38th day of trial, held November 18, 1992, at 199. Bass told Reynolds, "if I ever hear you say anything to another white woman, I'm going to fire your ass." *Id.* at 201.

40. *See* plaintiffs' exhibit 24, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

41. *See* exhibit 22, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996. After Reynolds received the letter informing him of the suspension, he requested and received a hearing before James Brown, an em-

However, although Arkle gave insubordination as a reason in his letter, he testified at the 1996 trial that insubordination was not one of the reasons he suspended Reynolds.[42] He testified that Reynolds was counseled for the insubordination, and the counseling was the only discipline he received.[43]

Although he chose not to disclose it to Reynolds in his letter and did not mention it to the other people at the meeting, Arkle had other reasons for suspending Reynolds. Arkle admitted during the 1996 trial that part of the reason he suspended Reynolds was that he thought that Reynolds liked to "stir [things] up, to cause trouble."[44] By this he meant that he considered Reynolds to have a history of disruptive behavior at the department, especially relating to the department's court-imposed grievance procedure.[45] He stated that Reynolds had tried to abuse the grievance system by filing eight grievances in ten weeks.[46] He believed that Reynolds was uncooperative during the department's investigations of his grievances. He had "heard" that Reynolds sometimes rejected the department's proposed settlements of his grievances without even reading them.[47] Finally, he had "heard" that Reynolds had told other employees not to settle their grievances with the department. Arkle admitted that these factors contributed to his decision to suspend Reynolds, and that he had not told anyone, including Reynolds, that he was

being suspended in part because of his participation in the grievance process.[48]

Also, in contrast, Arkle and his staff took no disciplinary action against Lett, who had physically threatened the life of a co-worker, and, in particular, to do so if the co-worker took advantage of the department's grievance procedure. Not until after Reynolds's attorney wrote a letter to the Transportation Department's counsel on March 8, 1996, complaining that "White employees in similar situations have not been suspended or treated the same as Reynolds,"[49] did Arkle initiate action against Lett on March 11, and Lett's punishment was only a suspension for three days for using threatening language.[50] Indeed, throughout the investigation, Lett was not aware that his conduct was at issue, and not until Lett received Arkle's March 11 letter, was he aware that he was being considered for punishment.[51]

On March 14, 1996, the department suspended Reynolds without pay for ten days.[52] No action was initiated or taken against any other employees—not Lett, not Jordan, not Carlisle, not Gibson—for using racial slurs in violation of the department's racial harassment policy. Reynolds responded with a claim, contained in a motion for injunction, challenging his suspension, and his suspen-

---

ployee of the department. Because the department conceded that Brown's evaluation was limited to determining whether Arkle had had enough evidence before him to reach the decision he made, the court considers Arkle, who recommended the suspension, and Butts, who approved it, to be the ultimate decision makers. *See* testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 786–90. However, the court notes that it is curious that the Transportation Department appointed Brown (a white person), and not Ron Green (an African–American person who is the department's equal employment opportunity officer) to handle this matter. *See id.* Indeed, Green's absence from the picture altogether is troubling.

42. *See* testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 455–57.

43. *See id.*

44. *Id.* at 894.

45. *See id.* at 891–96.

46. *See id.* at 894.

47. *See id.* at 894.

48. *See id.* at 897.

49. Plaintiffs' exhibit 8, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

50. *See* plaintiffs' exhibit 4, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

51. *See* testimony of Charles Lett, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 145–46.

52. *See* plaintiffs' exhibit 22, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

sion has been held in abeyance pending resolution of his claim.[53]

Finally, in the midst of trial, in response to the substantial evidence of continued use of racial slurs—in particular, the term "nigger"—in the department, the court entered an oral order requiring that the department show cause as to why further relief should not be ordered to eliminate racial harassment and the use of racial slurs at the department.[54] *Only then,* in response to this order, did the department finally initiate an investigation of the use of racial slurs.[55]

### B.

A full appreciation of the above events cannot be had, however, without the events being placed in the broader context of how the Transportation Department has viewed, and continues to view, departmental 'race relations' in general.

*The use of racial slurs at the Department of Transportation prior to the 1992 racial harassment policy:* During the 1992 partial trial, in response to extensive testimony about the use of racial slurs at the Department of Transportation, the court orally ordered the department to establish and implement a racial harassment policy. That testimony painted a disturbing picture of a work environment in which African–American employees were routinely demeaned, and in which white employees used the word "nigger" almost daily. Further, the department usually did nothing to discipline people who used such slurs, and took no steps to prevent their use. The use of racial slurs was pervasive; both supervisors and em-

ployees used slurs, and they were used in many of the department's various offices.

When Reynolds began work for the department in 1979 as one of its first black employees, he was regularly called a "nigger," [56] threatened by co-workers,[57] and reminded that the Ku Klux Klan was watching him.[58] Once, Reynolds was accused of trying to date white women. Caraway told Reynolds that having black men around white women made him "sick," [59] and Bass, Caraway, and V.E. Richey threatened to fire him if he ever asked a white woman for a date.[60]

But Reynolds was not the only employee subjected to racial slurs. Examples include the following:

In 1984 or 1985, Alfred Blankenship, a white employee, called Lesha Kelley, a black employee, a "nigger" in a department office in Alexander City while in the presence of Darrell Walker, a white supervisor. Walker did not reprimand Blankenship or otherwise indicate that the use of this racial slur was inappropriate.[61]

Sometime after 1989, Earl Young, a white supervisor, said within the earshot of a black employee that "them niggers don't know how to get out of [the] road" after he almost hit a black woman pedestrian.[62] Young was not reprimanded.

In early June 1990, Donnie Pinion, a white supervisor, told Frank Reed, a black employee, that he was "one nigger we are going to fire." [63] Reed went to James Horsley, a white supervisor, and told him of Pinion's use of the racial slur. Horsley told Reed that he would look into it, but

**53.** *See supra* note 1.

**54.** *See* oral order in open court, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 83.

**55.** *See* defendants' exhibit 7, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996. The court is unaware of the results of that investigation.

**56.** *See* testimony of Johnny Reynolds, transcript of 38th day of trial, held November 18, 1992, at 38.

**57.** *See id.* at 38–39.

**58.** *See id.* at 39.

**59.** *See id.* at 199.

**60.** *See id.* at 199–202.

**61.** *See* testimony of Lesha Kelley, transcript of 24th day of trial, held September 30, 1992, at 7–8.

**62.** Testimony of Jessie L. Smith, transcript of 28th day of trial, held October 6, 1992, at 121.

**63.** Testimony of Frank Reed, transcript of 24th day of trial, held September 30, 1992, at 115.

took no action.[64] Later, in late June 1990, Horsley himself used the same slur. During a meeting with Reed, Horsley told Reed that Horsley's purpose in coming to the department was to "take it back," referring to white employees taking the Third Division of the department back from black employees.[65] When Reed told Horsley that black employees had "never had it," Horsley said "Yeah you niggers been...."[66] Horsley did not finish the sentence. Despite Horsley's promise in June to look into Pinion's use of slurs, it is clear that he took no effective action.

In September 1990, Reed was working on the highway with Robert Craig, a black employee. Pinion approached in a truck and told Reed and Craig that when he visited the job site, he expected to see "niggers' assholes and elbows."[67]

Later in the same month, again when Reed and Craig were working along the highway, Pinion approached and said that when he drove up, he expected to see "You niggers skinning and grinning."[68] Pinion again called Reed a "nigger" in 1992 when Reed was working on route 459.[69]

The use of slurs also continued in the time leading up to and during the 1992 partial trial of this case. Examples include the following:

In late 1991, Jerry Burger, a white supervisor, told Reynolds that he and the other "niggers" had "killed" themselves by filing "that damned lawsuit."[70]

In November 1992, Jordan, a white supervisor, told Reynolds a joke using the word "nigger," and involving the Ku Klux Klan.[71]

That same month, Keith Maxwell, a white supervisor, referred to Reynolds as "Mr. Nigger" when he wore a tie and "a plain old nigger" when he did not.[72]

Also during the 1992 partial trial, Burger and Maxwell stated that the department's employment level of Civil Engineer–I stood for "colored engineer,"[73] and they referred to the work black engineers did as "afro-engineering."[74] They also discussed "nigger rigging," a term they used to mean that black employees were less adept at engineering than white employees.[75]

Further, after employees received a copy of the department's policy prohibiting racial harassment in November 1992, Maxwell approached Reynolds and said "I guess I can't call you nigger no more."[76] Indeed, Reynolds was called a "nigger" so often and heard his co-workers use the word so often that it no longer makes him extremely angry, although he does not like it and encourages others not to use it.[77]

This and other similar evidence convinced the court that many white employees and supervisors in the department used the word "nigger" and other racial slurs as part of their ordinary conversation and that they told racially derogatory jokes openly and with no apparent fear of punishment from supervisors. The evidence showed that the use of racial slurs was not limited to one or two offices or departments and was not limited to a small group of white employees.

---

64. *See id.* at 119.

65. *Id.* at 114.

66. *Id.*

67. *Id.* at 117.

68. *Id.* at 118.

69. *See id.* at 116.

70. *See* testimony of Johnny Reynolds, transcript of 38th day of trial, held November 18, 1992, at 166. The evidence also reflected that Burger told Reynolds that no matter "what a damned black judge say," the department would never treat black employees fairly. *Id.* However, although this evidence is properly admissible and can be considered by the court, the court believes it more prudent not to consider it, and has not.

71. *See id.* at 192.

72. *See id.* at 186.

73. *See id.* at 184–85.

74. *See id.* at 185–86.

75. *See id.* at 185.

76. *Id.* at 194.

77. *See id.* at 694.

Further, white employees were not reprimanded for referring to black people as "niggers" or for telling racially derogatory jokes. Faced with this overwhelming evidence of the use of racial slurs, and equally overwhelming evidence of the department's failure to investigate complaints of harassment or punish those who used racial slurs, the court orally ordered the department to implement a policy prohibiting the use of racial slurs, and the department adopted the policy on October 16, 1992.[78] That policy has been reissued by all subsequent directors of the department, including Butts.[79]

The stated goal of the department's racial harassment policy is to "express in unmistakable terms that" the prohibition on acts of racial discrimination extends to the "use of any and all racial slurs and racially derogatory words, statements or remarks in any form, verbal or written...."[80] The policy states that the "use of racial slurs by employees ... is not merely a personnel matter. The ... department has an obligation to investigate complaints and take necessary steps to ensure that any form of racial harassment by the use of racial slurs or racial words or remarks does not occur."[81] Both employees who have been "subjected" to a racial slur or "who become[ ] aware of any such situation" are called on to report the matter immediately so that the department can conduct a prompt investigation and take "appropriate action."[82] Further, "supervisors who condone" the use of racial slurs after learning of them are subject to discipline.[83] Thus, the policy imposes several

duties on employees, supervisors, and the department. First, employees who are subjected to racial slurs or who hear them used about others must report them. Second, supervisors not only must not use racial slurs themselves, they must not tolerate the use of racial slurs by other people. Finally, the department must both investigate complaints and take steps to ensure that racial slurs are not used. Because the policy promises to take "necessary steps to ensure that" slurs are not used,[84] the department clearly contemplated acting on allegations short of formal complaints, such as informal discussions between employees and supervisors, and taking steps short of discipline, such as issuing a general reminder that the use of slurs is prohibited.

The policy was later incorporated into the article XVII of consent decree I.

*Racial tensions since the adoption of the 1992 racial harassment policy:* The court has already described how racial slurs continue to be used at the Department of Transportation, and how the department continues to fail to respond. Although the testimony at the 1996 trial on Reynolds's challenge to his suspension focused on the use of slurs by employees and supervisors in Roadway Design, the evidence also showed that the department, from top to bottom, knew that racial slurs were commonly used and failed to act. Within Roadway Design, white employees and supervisors regularly use the word "nigger."[85] Squad leaders Lett and Jordan not only took no action when others used racial slurs in their presence—in direct

**78.** *See* exhibit 24, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

**79.** *See* exhibits 22 and 23, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996. The policy signed by Butts on June 19, 1995, exhibit 22, is slightly different from 1992 policy. Under the 1992 policy, the equal employment opportunity coordinator was charged with investigating complaints. *See* exhibit 24, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 5. Under the 1995 policy, the bureau chief of human resources is charged with investigating complaints.

**80.** Exhibit 22, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 2.

**81.** *Id.*

**82.** *Id.* at 3–4.

**83.** *See id.* at 2.

**84.** *See id.* at 3.

**85.** *See* testimony of Jessie L. Smith, transcript of 28th day of trial, held October 6, 1992, at 210.

violation of the department's own policy—they frequently used the word "nigger" themselves.[86] Wiggins, a section leader whose office was adjacent to the Roadway Design work room, did nothing to prevent the use of racial slurs despite their pervasive use in his section.

Lett, Jordan, and Wiggins were not the only supervisors who knew that racial slurs were used in Roadway Design but failed to act. Arkle admitted that he was aware of the racial tensions, but he did nothing. Indeed, Smith reported to Arkle on several occasions that supervisors, such as Lett and Jordan, were using racial slurs, and Arkle did nothing.[87] Fowler, Bass, and Butts all knew that racial slurs were regularly used in Roadway Design, but each did nothing. Although Arkle testified that the department's policy was to investigate any claim involving a racial slur—with or without corroboration—Arkle himself undermined this policy when he failed to respond to Smith's complaints in any way.

An incident involving Hudson Hinton, a black employee of the department, and David P. McAteer, a white employee, further illustrates the department's typical response to allegations of the use of a racial slur and its enforcement of its racial harassment policy. On July 20, 1994, Hinton and Stan Biddick, a white supervisor, joked with McAteer throughout the day about McAteer's slacks.[88] In the afternoon, after Hinton had pointed at McAteer's slacks and smiled, McAteer "blew up" and called Hinton a "damn nigger."[89] Carey Kelly, a supervisor, heard from McAteer that he and Hinton had had a disagreement, and Kelly called Hinton to his office to discuss the problem.[90] Hinton told him that McAteer had called him a "damn nigger." Kelly responded by asking Hinton what he had done to provoke McAteer or cause McAteer to use the slur.[91] Further, Kelly told Hinton that McAteer was having problems at home which could have led to McAteer's use of the slur.[92] McAteer did not deny using the racial slur; rather, he claimed that he simply could not remember what he had said.[93] Eventually, both employees were given verbal reprimands: Hinton for teasing and McAteer for cursing.[94] Biddick, who initiated the teasing and participated in it throughout the day, was not disciplined.

Hinton later met with Arkle to discuss the situation. Although he did not tell Hinton at the time,[95] after hearing Hinton's version of the confrontation, Arkle believed Hinton because he had "faith in him, that what he said was true. I don't believe he'd make something like that up."[96] Despite "personally" believing Hinton,[97] Arkle nonetheless decided that the department should not make any determination about whether the slur was used. He "was afraid" that if "one person's word about a racial slur [was] allowed to result in suspension of an employee, that . . . was setting a poor precedent. . . ."[98] He feared that if he acted based solely on Hinton's word, "we could have a lot of accusa-

86. *See id.* at 211.

87. *See id.* at 210–11.

88. *See* testimony of Hudson Hinton, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 588.

89. *See id.* at 589; *see also* defendants' exhibit 8, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

90. *See* testimony of Hudson Hinton, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 590.

91. *See id.* at 603–04.

92. *See id.* at 601.

93. *See id.* at 605; Testimony of Carolyn Robinson, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 835.

94. *See* Testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 423, 425.

95. *See* testimony of Hudson Hinton, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 605–06.

96. Testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 427–28.

97. *See id.* at 427.

98. *Id.* at 428.

tions made," and no effective way to handle them.[99] Further, Arkle felt that Hinton had "brought on" the slur by teasing McAteer.[100] Although he acknowledged that requiring corroboration could convince employees that it was futile to file a complaint and could embolden those who wished to use racial slurs, he felt that such incidents should be reported.[101] He believed that if enough incidents were reported, eventually "it would lend some believability about it."[102] Arkle told Hinton that if he was dissatisfied with the outcome, he could file a grievance with the equal employment opportunity office.

To decide whether to file a grievance, Hinton met with Carolyn Robinson of the equal employment opportunity office. She reviewed the report from Kelly giving Hinton's and McAteer's versions of the confrontation. From her review of the record, she felt unable to make a finding as to who was telling the truth[103] and that without more evidence that she could not determine whether the slur had been used.[104] She said that she would be convinced if Hinton produced a witness who overheard McAteer, or if McAteer confessed. Beyond this, she offered Hinton no advice as to how else he could convince her that he was telling the truth.[105] Although she acknowledged that she could have recommended training or counseling for McAteer or for the entire section without having determined who was telling the truth, she did not do so in this case.[106] Robinson concluded that even if she had recommended discipline for McAteer, her recommendation would be rejected unless Hinton produced more corroborative evidence.[107] Robinson told Hinton that filing a formal grievance would be futile because she would be the person who investigated the grievance, and without more evidence, she could not determine who was telling the truth.[108]

This evidence demonstrates that the department requires either a corroborating witness or a confession from the employee accused of using a racial slur before it would act. Both Arkle and Robinson felt that unless a complaining employee could produce a witness to the alleged use of a racial slur or a confession, there was nothing the department could do because the evidence would consist of only one person's word against another's. Such a corroboration requirement is inappropriate. First, that a complaining employee does not have a corroborating witness does not mean that there is no corroborating evidence to be found. A thorough investigation by the department could lead to such evidence, as the department's investigation into Reynolds's alleged conduct demonstrates. Second, that an employee used slurs only in private does not lessen their harmful effect, and should not shield him from the department's racial harassment policy. Third, as Arkle admitted, requiring corroboration will inevitably convince employees that their complaints will not be taken seriously and will discourage employees from filing grievances. More disturbingly, the evidence shows that white employees at the department have learned that they can use racial slurs with impunity as long as they do not do so in front of black employees. Finally, under the department's racial harassment policy and the court's prior orders, the department's fundamental responsibility is to prevent the use of racial slurs, and this may be done through counseling and monitoring of the parties, without necessarily determining whether the slur was actually used.

## III. DISCUSSION

Against this evidentiary background, the court now considers Reynolds's claims.

99. *Id.*

100. *See id.* at 405–06.

101. *See id.* at 429.

102. *Id.* at 429.

103. *See* testimony of Carolyn Robinson, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 835–36.

104. *See id.* at 835–36.

105. *See id.* at 840.

106. *See id.* at 855.

107. *See id.* at 848.

108. *See id.* at 837–38.

First, Reynolds claims that he was disciplined because of his race, in violation of Title VII. 42 U.S.C.A. § 2000e–2(a)(1) provides, in part, as follows: "It shall be an unlawful employment practice for an employer to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." Second, he contends that he was retaliated against for engaging in protected conduct in violation of Title VII. 42 U.S.C.A. § 2000e–3(a) provides, in part, as follows: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

To prevail on these claims, Reynolds must establish a prima-facie case of either disparate treatment or retaliation. Establishing a prima-facie case "creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this approach, known as the *McDonnell Douglas* approach, the burden then shifts to the employer to rebut the presumption by producing a legitimate, nondiscriminatory or nonretaliatory reason for the employment decision. The rebuttal burden is one of production only, and the employer does not have to persuade the court that it was actually motivated by the proffered reason. *Id.* at 253–55, 101 S.Ct. at 1093–94. If the employer satisfies this burden of production, the employee must prove by a preponderance of the evidence that the employer's proffered reason for its employment decision is a pretext for discrimination or retaliation. The employee may meet this burden by persuading the fact finder either *directly* that a discriminatory or retaliatory reason more than likely motivated the employer or *indirectly* that the proffered reason for the employment decision is not worthy of belief. *Id.* at 256, 101 S.Ct. at 1095.

■ However, where, as in this case, the court has sufficient evidence to determine whether an employee has been a victim of discrimination, the court need not go through the *McDonnell Douglas* burden-shifting process and should instead reach the ultimate issue of discrimination. "If ... the defendant has succeeded in carrying its burden of production, the McDonnell Douglas framework—with its presumptions and burdens—is no longer relevant.... The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See also United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Powers v. Alabama Department of Education*, 854 F.2d 1285, 1290 (11th Cir.1988).

Moreover, the Supreme Court announced the *McDonnell Douglas* approach before the 1991 amendments to Title VII. Under *McDonnell Douglas*, the burden of persuasion never shifts from the employee or plaintiff. However, under the 1991 amendments, to establish liability, the employee need only show "that race ... was a motivating factor for any employment practice, even though other factors also motivated the practice," 42 U.S.C.A. § 2000e–2(m), and then, to avoid the full array of remedies, the employer must "demonstrate[ ] that [it] would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C.A. § 2000e–5(g)(2)(B).

■ Nonetheless, the *McDonnell Douglas* analysis may still be helpful in fully tried cases to which the 1991 amendments apply and in which the employee relies on circumstantial evidence. Such cases pose "difficult" and "sensitive" issues of subjective intent and objective action. *Aikens*, 460 U.S. at 716, 103 S.Ct. 1478, 75 L.Ed.2d 403. The *McDonnell Douglas* analysis provides an invaluable method of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *Burdine*, 450 U.S. at 255, n. 8, 101 S.Ct. at 1094, n. 8. Positing such elementary *McDonnell*

*Douglas* questions as whether the elements for a prima-facie case are present (in particular, whether the plaintiff was treated differently from a similarly situated person of a group different from that to which the plaintiff belongs), the clarity and nature of the employer's justification, and whether the justification is pretextual, and, if so, whether it is a pretext for discrimination, would help to assure that, in resolving the Title VII claim and, in particular, in resolving the ultimate issues of whether race was a motivating factor for the decision by the employer, even though other factors also motivated the employer, and whether the employer would have taken the same adverse employment action against the employee even in the absence of the impermissible factor, 42 U.S.C.A. §§ 2000e–2(m) & 2000e–5(g)(2)(B), the court arrives at its ultimate conclusions less through intuition and more through factual reasoning and analysis. *See, e.g., Noble v. Alabama Dep't of Envtl. Management,* 872 F.2d 361, 365 n. 4 (11th Cir.1989). However, because the *McDonnell Douglas* analysis is only a "procedural device," *St. Mary's Honor Center,* 509 U.S. at 521, 113 S.Ct. at 2755, it should not be applied too rigidly; nor should it be viewed as an end in itself. For example, the mere disbelief of the employer's proffered reason does not "compel" a finding of discrimination. *Id.* at 510–12, 113 S.Ct. at 2749. In other words, the *McDonnell Douglas* approach should not be used by the court as a "substitute" for determining, on a case-by-case basis, whether the evidence is or is not sufficient to allow the fact finder to conclude that the employee has, in fact, been a victim of discrimination. *Moore v. Alabama State Univ.,* 864 F.2d 103, 105 (11th Cir. 1989).

As stated, the Transportation Department offers two reasons for suspending Reynolds: first, Reynolds had made false statements involving racial slurs which created a disruption in the office; and, second, he violated the department's June 1995 memorandum which prohibits the making of false statements during an investigation into a charge

of racial harassment.[109] The court therefore now turns to whether these two reasons are pretexts for racial discrimination or retaliation.

### A.

■ As stated, Reynolds claims that he has been suspended because of his race, and, of course, Title VII prohibits an employer from discriminating against employees based on race. 42 U.S.C.A. § 2000e–2(a)(1). When the alleged discrimination involves the application of workplace rules, the plaintiff can prevail by showing "that he did not violate the work rule," *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir.1989), or "that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *Id.* To show that his conduct was similar, the plaintiff need only show that the conduct for which he was disciplined and the conduct of the other employee who was treated less severely was of "comparable seriousness." *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 284 n. 11, 96 S.Ct. 2574, 2580 n. 11, 49 L.Ed.2d 493 (1976), *quoting McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973) (emphasis omitted).

■ Applying the above principles, the court concludes that the evidence is overwhelming that the Transportation Department's first reason for suspending Reynolds—that Reynolds had made false statements involving racial slurs which created a disruption in the office—is a pretext for racial discrimination. Although the department currently has a policy prohibiting the use of racial slurs, the evidence presented at trial revealed that white employees and supervisors continue to use the word "nigger" regularly, that employees—both white and black—have complained, and that the de-

---

**109.** In the letter to Reynolds, the Transportation Department offered a third reason for his suspension, that he had "committed acts of insubordination" by refusing to cooperate during the in-

vestigation. However, at trial, the department admitted that this was not really a basis for his suspension.

partment has failed to respond. *As stated, during the investigation of Reynolds, Butts learned that racial slurs were regularly used in Roadway Design by Lett and Jordan. Butts did nothing. During the investigation of Reynolds, Bass learned that racial slurs were regularly used in Roadway Design by Lett and Jordan. Bass did nothing. During the investigation of Reynolds, Arkle learned that racial slurs were regularly used in Roadway Design by Lett and Jordan. Arkle did nothing. During the investigation of Reynolds, Bush learned that racial slurs were regularly used in Roadway Design by Lett and Jordan. Bush did nothing. During the investigation of Reynolds, Reese learned that racial slurs were regularly used in Roadway Design by Lett and Jordan. Reese did nothing. During the investigation of Reynolds, Wiggins learned that racial slurs were regularly used in Roadway Design by Lett and Jordan. Wiggins did nothing. Indeed, as to most, if not all, of these men, what they learned merely confirmed what they already knew. But they did nothing; they all chose to do nothing.*[110]

The department admits that it considers a false allegation that a white employee used a racial slur to be a serious matter.[111] It also contends that it considers the use of racial slurs such as the word "nigger" to be a serious matter.[112] Indeed, when officials of the department were considering the appropriate discipline for Reynolds, the only incident they considered similar was one in which Eddie Lester, a white employee, called Frank Topping, a black employee, a "nigger" and threatened to kill him.[113] From this, the court concludes that the department considered the 'proved' instances of the use of the word "nigger" by white employees to be of "comparable seriousness" *McDonald,* 427 U.S. at 284 n. 11, 96 S.Ct. at 2580 n. 11, to an

inaccurate 'accusation' by a black employee that a white employee had used the slur. Thus, Reynolds has established that he "engaged in misconduct similar to that of a person outside the protected class." *Gerwens,* 874 F.2d at 1540.

Further, the department had received many reports of the use of racial slurs and had done nothing to follow up on these allegations. In contrast to the swift and wide-ranging investigation of this incident, these other reports, despite their number and similarity, prompted no investigations or hearings, and no one was suspended or otherwise disciplined. From this, the court concludes that Reynolds has shown that the department's response to his so-called wrongdoing was "more severe than" its response to "the other persons who engaged in similar misconduct." *Id.* Indeed, the department's punishment of Reynolds without initially taking any action against Lett (who had not only threatened to injure a co-worker, but had based the threat on the co-worker's use of the department's grievance procedure) reflects that the department took more severe action against Reynolds while taking no action whatsoever against a white person who had engaged in much more disruptive conduct.

The department's swift response to this situation involving white employees and its failure to respond to complaints from black employees further reflect its total, and continued, disregard for its black employees. According to the department, the injuring words were spoken by Reynolds, and the injured persons were Lett and Scott. When the department saw itself faced with a black wrongdoer and white victims, it immediately responded with the most extensive investigation in its history. The department assigned a former police officer to conduct the investigation, and the investigating officer sought out all employees with any knowledge of the situation. The department did not require the

---

110. To be sure, the department finally did initiate an investigation of the use of racial slurs. However, as stated, this was only in response to a show cause order issued by the court. The court is unaware of the results of that investigation.

111. *See* testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 498.

112. *See id.* at 349–50.

113. *See id.* at 408–10.

employees to prove what had occurred; it sought to determine the facts for itself. In contrast, when faced with white wrongdoers and black victims, the department has consistently done nothing unless the black employee could prove his case by providing witnesses or by obtaining a confession from the wrongdoer. By failing to investigate complaints by black employees against white employees, the department conveyed the message to its black employees that it did not take their complaints seriously and that the word "nigger" was acceptable at the department. It told white employees that they could treat their black co-workers disrespectfully with impunity. By swiftly and vigorously investigating a complaint made by a white employee against a black employee, the department conveyed the message to black employees that they spoke out against harassment at their peril. It told white employees that the department would support them and would require black employees to conclusively prove any alleged use of racial slurs.

It is also important to remember that Reynolds's conclusion that Lett had called him a "nigger," while arguably imprudent, was not an insupportable inference from what Scott had told him. Scott did tell Reynolds that Lett was using the term "nigger" and that Lett was talking about him behind his back. Reynolds simply put the two together. While Scott had not expressly told Reynolds that Lett has called him a "nigger," Scott had implied as much.[114] Indeed, when the department's own investigator asked Lett directly whether he had ever said that Reynolds was a "nigger," Lett's only response was to clear his throat.[115] Considering all of this evidence, the court is convinced that Reynolds reasonably believed that Lett had called him a "nigger" and that Scott had accused Lett of doing so.

It must also be remembered that Reynolds was a victim. Regardless as to whether Lett had used the term "nigger" and had talked about Reynolds behind his back or whether he had called Reynolds a "nigger," Lett had still referred to African–Americans as "niggers" while working for the Transportation Department; Reynolds was, and still is, entitled to a work environment that is free of racial harassment. Nevertheless, Reynolds did not voice his grievance in a disruptive manner; his discussion with Lett was calm and professional, and once Lett denied having made the statement, Reynolds dropped the matter. Reynolds, unlike Lett, did nothing disloyal, uncooperative, or likely to disrupt productivity.

The department further contends that, although Reynolds's conversation with Lett was calm, Reynolds is nonetheless responsible for Lett's violent confrontation with Scott. It contends that Reynolds's behavior amounted to an incitement. This argument has no merit. First, Lett neither said nor did anything while he was talking to Reynolds to indicate that he would later threaten Scott's life. Second, approximately two hours after his conversation with Reynolds, Lett spoke with Reese, his supervisor, about his conversation with Reynolds. Lett neither said nor did anything in this conversation to indicate that he would later threaten Scott's life.

Indeed, the Transportation Department's eagerness to punish Reynolds and its reluctance to punish Lett dramatically set in relief the racial bias the department harbors against Reynolds. The Transportation Department faults Reynolds (the victim of Lett's racial slurs) for not predicting that Lett would threaten physical violence and attempts to absolve Lett (the apparent perpetrator of racial slurs, regardless as to whom they were directed) of actually threatening physical violence. The irrational dif-

---

**114.** Indeed, if the department had been even-handed, it should have also disciplined Scott, along with Reynolds, for implying that Lett had called Reynolds a "nigger." Of course, the real issue here—one that the department simply refuses, and apparently intentionally so, to come to grips with—is that the culprit here is Lett. Lett should not be using the term at all in the work setting.

**115.** *See* transcript of interview with Lett, taken February 29, 1996, exhibit 15, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

ference in treatment can be explained by only an irrational motive: race.

From all the evidence, therefore, the court is convinced, and so finds, that the department singled Reynolds out for discipline and suspended him because he is an African–American. But for his race, Reynolds would not have been suspended.

The court further concludes that the evidence is overwhelming that the Transportation Department's second reason for suspending Reynolds—that he violated the department's June 1995 memorandum which prohibits the making of false statements during an investigation into a charge of racial harassment—is a pretext for discrimination. However, in considering this reason, the court first notes that it cannot agree with Reynolds's contention that the June 1995 memorandum may not be applied against him because it illegally modifies the department's racial harassment policy. As stated, during the 1992 partial trial of this case, the court orally ordered the department to adopt a policy prohibiting the use of racial slurs. The department adopted such a policy on October 16, 1992, and the racial harassment policy remains in effect pursuant to article XVII of consent decree I. In 1995, Butts reaffirmed the department's commitment to the policy in the June 1995 memorandum, writing that "I am directing that an investigation be conducted into each alleged act of racial discrimination to determine the identity of the actor and will discipline anyone so identified. Disciplinary action will also be taken against an employee who falsifies or otherwise makes misstatements of fact." Reynolds claims that, because the October 1992 policy contains no such provision, discipline for making a false statement violates the consent decree. The court cannot agree. There is nothing in consent decree I or any other order of this case preventing the Transportation Department from making its racial harassment policy more strict. Indeed, an employee should not be free to

make false statements during an internal investigation. Reynolds's contention that the department may not adopt a policy prohibiting employees from making false statements during a departmental investigation into a charge of racial harassment must be rejected.

Reynolds further claims that even if a rule against making false statements *during* an investigation is proper, the department has never before applied a rule against making false statements to other employees *outside* of an investigation. In other words, it cannot discipline Reynolds because he did not make a false statement during an investigation. The court agrees with Reynolds. Arkle admits that this broad interpretation of the June 1995 memorandum is a novel one and that the department had never before investigated, much less suspended, an employee simply for making a false statement to another employee.[116] Based on this, the court finds that the department's application of its June 1995 memorandum to Reynolds, and its decision to interpret the memorandum to make all false statements subject to discipline, were racially motivated. Indeed, the court is convinced that the department interpreted the policy in this way solely to justify its decision to suspend Reynolds. Accordingly, Reynolds has shown that he did not violate the work rule because that rule in question did not actually exist when he committed the alleged wrong. The department applied the June 1995 memorandum to Reynolds because he is an African–American.

Moreover, even if Reynolds could be considered as having violated the June 1995 memorandum, the department's suspension of him without taking any disciplinary action against white employees who also violated the department's racial harassment policy and who, as already explained by the court, engaged in comparable, and even worse, conduct, reflects that the department's action against Reynolds was racially motivated. *See Sims v. Montgomery County Comm'n,* 544 F.Supp. 420, 426 (M.D.Ala.1982) ("uneven application of criteria is strong evidence

116. *See* testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary in-

junction, held April 1 through 5, 1996, at 361.

that the criteria were never in fact employed in the selection process and were used by the employer as merely a pretext for discrimination"). Again, but for his race, Reynolds would not have been suspended.

Finally, the court concludes that, even if the Transportation Department properly decided to discipline Reynolds, the punishment he received was more severe because of his race. Reynolds was suspended without pay for ten days. Although Lett was finally suspended without pay for three days, he was initially not suspended at all. Reynolds claims that although his conduct was similar to that of Lett, the department treated him more severely. He maintains that when he went to speak with Lett on February 26, he had heard that Lett had been talking about him behind his back and he wanted to ask Lett about it. He claims that his conduct was similar to Lett's, in that, when Lett went to speak to Scott on February 27, Lett had heard that Scott had been talking about him behind his back and he wanted not only to ask Scott about it but also to threaten Scott with violence if Scott intended to pursue relief under the department's grievance procedure. Thus, he maintains, he and Lett were in similar positions of having violated the department's grievance procedure, and, although Reynolds acted with more restraint than Lett, Reynolds was disciplined much more severely.

The court agrees with Reynolds and finds that the department's decision to discipline him much more severely than Lett was racially motivated. At worst, Reynolds was imprudent. Reynolds told Lett that Scott had accused Lett of calling Reynolds a "nigger" when Scott had not made such an allegation. As stated, Scott had conveyed a great deal of information to Reynolds suggesting that Lett used racial slurs and did not like Reynolds, but he had not told Reynolds that Lett had referred to him as a "nigger." Although it was perhaps imprudent for Reynolds to tell Lett that Scott had said he called Reynolds a "nigger," it was a natural inference to conclude further that

Lett had, in fact, done so. Lett's threat to assault Scott physically if he took advantage of the department's grievance procedure was clearly more egregious than anything Reynolds may be considered to have done.

### B.

■ The court turns next to Reynolds's claim that the Department of Transportation retaliated against him for protected conduct in violation of Title VII. As stated, Title VII provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e–3(a). Title VII therefore prohibits employers from retaliating against employees for engaging in two types of expression: first, opposing unlawful employment practices; and, second, participating in Title VII proceedings.

■ Title VII provides almost absolute protection to "employees against retaliation for their participation in the procedure established by [it] to enforce its provisions." *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1135 (5th Cir. Unit A 1981).[117] In contrast, "the protection afforded" those who oppose unlawful practices by other methods, such as protests or informal complaints, "is not absolute." *Rollins v. Florida Dep't of Law Enforcement,* 868 F.2d 397, 401 (11th Cir.1989) (per curiam). In such a case, the employee must show 'that "he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." *Bigge v. Albertsons, Inc.,* 894 F.2d 1497, 1503 (11th Cir. 1990). Further, an employer may, in some circumstances, avoid liability if it can show that it disciplined the employee not because of his opposition but because the opposition took a form which was "disruptive" or which

---

117. In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

"impair[ed] the morale of [the] unit." *Rollins*, 868 F.2d at 401.

To establish a prima-facie case of retaliation, "the plaintiff must show (1) that [he] engaged in statutorily protected expression; (2) that [he] suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir.1994). To establish the causal relation requirement, the plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571–72 (11th Cir.1993). Reynolds claims that the Transportation Department illegally suspended him in retaliation for his participation in the department's grievance procedure.

It is undisputed that two of three prima-facie factors have been satisfied. Reynolds suffered an adverse employment action—he was suspended without pay. In addition, while Arkle did not list Reynolds's participation in the department's grievance procedure as a reason for Reynolds's suspension, Arkle stated at the 1996 trial that this was, in fact, a motivating reason. Arkle admitted that he considered three aspects of Reynolds's participation in the department's grievance process when he decided to suspend Reynolds: (1) that Reynolds himself had filed eight grievances in ten weeks; (2) Reynolds's advice to other class members that they should pursue their grievances to trial rather than settle them; and (3) Reynolds's unwillingness to consider the department's proposed settlement of his grievances. Arkle did not limit his consideration of these

factors to his evaluation of Reynolds's credibility. Rather, they were factors which caused him to suspend Reynolds.[118] Therefore, the only unresolved issue is whether Reynolds's participation in the grievance process was protected conduct under Title VII.

Reynolds claims that, because the Department of Transportation's grievance procedure was established pursuant to court order and remains in effect under consent decree I, it constitutes a proceeding under Title VII. Under the consent decree approved by the court, the department was required to develop and implement a procedure for handling complaints of discrimination.[119] The department submitted a grievance procedure on August 9, 1995,[120] and the court approved it the same day.[121] In the order approving the grievance procedure, the court also ordered the department to comply with the procedure. The grievance procedure defines a grievance as "an alleged wrong based upon the employee's race, color, creed, sex, national origin, age, or handicap"[122] and describes the steps in the process, beginning with the filing of a grievance through a hearing and external review. The procedure promises that grievants will be free "from restraint, interference, discrimination or reprisal for presenting a grievance."[123] Further, the procedure provides that if a person files three or more frivolous grievances within twelve months, all of his future grievances must be reviewed by counsel for the plaintiff class and a designee for the department before the department is required to investigate or take any of the other steps in the process.[124]

Whether an employer's internal grievance procedure constitutes a proceeding under Ti-

---

118. Arkle testified that he also considered two other incidents involving Reynolds. The first was that Reynolds had once been caught playing solitaire on his computer. *See* testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 891. The second was that Reynolds had once taken longer than his allotted lunch break. *See id.* at 894. The court is convinced that these two factors played almost no role in Arkle's decision to suspend Reynolds.

119. *See* consent decree I, article XIX, ¶ 7.

120. *See* revised complaint procedure, filed August 9, 1995 (Doc. no. 706). Although this document uses the words 'complaint' and 'grievance' interchangeably, the court has used the word grievance for the sake of clarity.

121. *See* order, entered August 9, 1995 (Doc. no. 707).

122. Revised complaint procedure, filed August 9, 1995 (Doc. no. 706), at 2.

123. *Id.*

124. *See id.* at 11.

tle VII appears to be an open question in this circuit. The Eleventh Circuit Court of Appeals in *Rollins* found that under the facts of that case, the employee who used the internal grievance procedure should receive only the limited protection afforded to those who 'oppose' unlawful employment practices, *Rollins*, 868 F.2d at 400, suggesting that the employer's internal grievance procedure did not constitute a 'proceeding' for the purposes of Title VII. However, the court finds that, on the facts of this case, the department's grievance procedure constitutes a 'proceeding.' *Rollins* differs from this case in several important respects. First, there was no evidence in *Rollins* that the employer's grievance procedure was established pursuant to court order. *Id.* In contrast, the department's grievance procedure was set up pursuant to court order that was expressly entered pursuant to Title VII, and the department is under that court order to comply with it. Second, in *Rollins*, the employee often refused to follow the formal complaint procedure, preferring to write her complaints on her time sheets rather than filing a formal complaint. *Id.* at 399. In this case, there is no evidence that Reynolds refused to follow the formal procedure. Although Arkle testified that Reynolds filed too many grievances, he admitted that Reynolds filed them on the official department grievance form, using the appropriate channels. Third, in *Rollins*, the employee's frequent complaints, often made in insulting and unprofessional language, *id.*, consumed more of her supervisor's time than those of all other employees combined. Although Reynolds filed many grievances, under the department's grievance procedure,

the grievances of people who filed frequent and frivolous grievances could be dismissed without investigation if certain conditions were met. Thus, the department was not required to spend time investigating the grievances of employees whose prior grievances had proved to be frivolous. Arkle believed that Reynolds advised others not to settle their grievances and refused to settle his, thereby causing the department to spend more time on the grievances than would have been required had the employees decided to settle them. Reynolds's preference for a hearing rather than a settlement merely shows that he preferred to use the tools provided in the grievance procedure, and, as stated, if his grievances were frivolous, the department was not required to spend any time investigating them. Finally, the grievance procedure itself protects employees against reprisal for 'presenting' a grievance. Considering all of these factors, the court finds that the department's grievance procedure constitutes a proceeding for the purposes of Title VII. Therefore, Reynolds may not be disciplined for filing grievances or for refusing to settle his own grievances. In addition, because Title VII extends protection to those who "assist[ ], or participate[ ] in any manner in an investigation, proceeding, or hearing," Reynolds may not be disciplined for advising other grievants that they should not settle their claims.[125]

Reynolds also claims that the department suspended him because of his participation in this lawsuit. Although the court is convinced that Reynolds's participation in this lawsuit was a motivating factor, it is unnecessary to

---

**125.** Even if the court had found that the department's grievance procedure did not constitute a 'proceeding' under Title VII, on the facts of this case, Reynolds would still prevail. Reynolds's filing of grievances and his position that he would not, and others should not, accept the department's settlement offers were neither "disruptive" nor "inappropriate." *Rollins*, 868 F.2d at 401. Accordingly, his behavior would be protected even if the court had not concluded that the department's grievance procedure were a proceeding under Title VII and Reynolds's behavior was considered mere 'opposition,' rather than 'participation.'

The department has suggested that the court should treat this case as a 'mixed-motives' case and consider whether, assuming that it was im-

proper to suspend Reynolds for his participation in the grievance process, it would have suspended him even without considering this improper reason. *See, e.g., Haynes v. W.C. Caye & Co., Inc.*, 52 F.3d 928, 929 (11th Cir.1995) ("defendant can avoid liability only by proving that it would have made the same decision even if it had not allowed such discrimination to play a role"). The court has found that the only non-discriminatory reasons offered by the department were that Reynolds played solitaire on his computer, and that, on one occasion, he took a long break. Because the department does not contend that these factors played a significant role in Reynolds's suspension, the court need not consider this argument.

rely on this ground. Reynolds further claims that the Department of Transportation may not suspend him for his conversation with Lett because, when he asked Lett if Lett had called him a "nigger," he was 'participating' in the department's grievance procedure and he was 'opposing' activity prohibited by Title VII. He argues that, because the department's grievance procedure provides that complaints of racial harassment should be resolved informally if possible, his conversation with Lett constitutes protected 'participation' in a proceeding to enforce Title VII. He further argues that the conversation constituted protected opposition because he reasonably believed that Lett had used the slur and his approach to Lett was calm and non-disruptive. Because the court has concluded that Reynolds was retaliated against based upon his participation in the grievance procedure, it is unnecessary to reach these additional grounds.

## IV. CONCLUSION

In conclusion, the Transportation Department suspended Reynolds because of his race and in retaliation for protected conduct, in violation of Title VII. Others in the Transportation Department, not Reynolds, are guilty of violations of the department's racial harassment policy. Director Butts, Chief Engineer Bass, Design Bureau Chief Arkle, Roadway Design Engineer Bush, Assistant Roadway Design Engineer Reese, Section Leader Wiggins, Squad Leader Lett, and Squad Leader Jordan, have all violated the department's racial harassment policy. Although aware of both isolated and widespread instances of the use of the word "nigger," they failed to take any corrective measure. Moreover, because they failed to take corrective measure, they set the stage for—that is, they created the environment that led to—the racial strife that spawned this litigation. If anyone deserves suspension, they do. Indeed, until they assume the responsibility placed on them by federal law and the orders of this court to enforce the Transportation Department's racial harassment policy aggressively and expansively, they will continue to have incidents similar to, if not worse than, that involving Reynolds, Scott, and Lett.

An appropriate judgment will be entered.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) Judgment is entered in favor of plaintiff Johnny Reynolds and against defendants Alabama Department of Transportation and Jimmy Butts;

(2) It is DECLARED that defendants Alabama Department of Transportation and Jimmy Butts suspended plaintiff Reynolds because of his race and in retaliation for protected conduct, in violation of Title VII of the Civil Right Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17;

(3) The motion for a preliminary injunction, filed by the plaintiffs on March 18, 1996 (Doc. no. 961), and treated as a motion for a permanent injunction by order entered April 4, 1996 (Doc. no. 976), is granted; and

(4) Defendants Alabama Department of Transportation and Jimmy Butts and their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order, are each ENJOINED and RESTRAINED from suspending plaintiff Reynolds based on an exchange he had with Charles Lett in February 1996.

It is further ORDERED that costs are taxed against defendants Alabama Department of Transportation and Jimmy Butts, for which execution may issue.

The clerk of the court is DIRECTED to issue a writ of injunction.

The clerk of the court is DIRECTED to provide for service of a copy of this order and injunction upon defendants Alabama Department of Transportation and Jimmy Butts by certified mail, returned receipt requested.

## ORDER AND INJUNCTION

In open court on April 1, 1996, the court entered an oral order requiring that defen-

dant Alabama Department of Transportation show cause as to why further relief should not be ordered to eliminate racial harassment and the use of racial slurs in the department. Having now heard all the evidence, the court concludes that the solution to the problem is not a reworking or expansion of the department's racial harassment policy, which was adopted pursuant to a court directive in 1992, and which is now incorporated in article XVII in consent decree I.* The problem is instead that there has been a complete, or almost complete, failure of enforcement. This problem should be addressed through civil and criminal contempt proceedings. *Newman v. Alabama,* 683 F.2d 1312 (1982); *Wyatt v. Rogers,.* 92 F.3d 1074, 1078 n. 8 (11th Cir.1996). If, after updating themselves on the racial conditions within the department, the plaintiffs believe that the department is still failing to enforce the racial harassment policy adequately, the plaintiffs may file a motion for civil and criminal contempt against those who have violated the racial harassment policy.

Nevertheless, the court believes that certain additional, but minimal, procedural measures are appropriate to help assure compliance in the future with the department's racial harassment policy.

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that defendants Alabama Department of Transportation and Jimmy Butts and their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order, are each ENJOINED and RESTRAINED from failing to comply with the Alabama Department of Transportation's racial harassment policy, a copy of which is attached to this order.

It is further ORDERED that defendants Alabama Department of Transportation and Jimmy Butts shall, within 60 days, provide a copy of this order and the attached racial harassment policy to each and every supervisor in the Alabama Department of Transportation.

It is further ORDERED that defendants Alabama Department of Transportation and Jimmy Butts shall submit to the court, within 60 days, an individual affidavit from each and every supervisor in the Alabama Department of Transportation attesting to the following:

(1) The supervisor has received a copy of this order and the attached racial harassment policy;

(2) The supervisor understands that he or she is obligated to do the following:

(a) Comply with the racial harassment policy;

(b) Report in writing to the EEO Monitor (who is currently Ron Green), within seven days, any violation of the racial harassment policy by any employee (including, but not limited to, any use of racial slurs, such as "nigger," etc., or the telling of any racial derogatory jokes, by any employee in the workplace); and

(c) Take disciplinary action against any employee who violates the racial harassment policy;

(3) The supervisor understands that the failure to comply with this order and the attached racial harassment policy will subject him or her to civil and criminal contempt sanctions (including fines and imprisonment) in the United States District Court;

(4) The supervisor has furnished a copy of this order and the racial harassment policy to all persons whom he or she supervises and listed all their names in his or her affidavit;

(5) The supervisor has explained to all persons whom he or she supervises that they are obligated to do the following:

(a) Comply with the racial harassment policy; and

(b) Report in writing to both his or her supervisor and the EEO Monitor (who is currently Ron Green), within seven days, any violation of the racial harassment policy by any co-employee (including but not limited to, any use of racial slurs, such as "nigger," etc., or the telling of any racially derogatory jokes, by any employee in the workplace);

---

* *See* exhibit 24, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

(6) The supervisor has explained to all persons whom he or she supervises that they will be subject to disciplinary action if they violate this order and the attached racial harassment policy; and

(7) The supervisor has explained to all persons whom he or she supervises that their failure to comply with this order and the attached racial harassment policy will subject them to civil and criminal contempt sanctions (including fines and imprisonment) in the United States District Court.

The clerk of the court is DIRECTED to issue a writ of injunction.

The clerk of the court is DIRECTED to provide for service of this order and injunction upon defendants Alabama Department of Transportation and Jimmy Butts by certified mail, returned receipt requested.

The clerk of the court is DIRECTED to provide for service of a copy of this order and injunction upon the United States Attorney for the Middle District of Alabama by certified mail, returned receipt requested.